WESTPORT INSURANCE CORPORATION,
Plaintiff-Appellant,

GRANITE STATE INSURANCE COMPANY,
National Union Fire Insurance Company of
Pittsburgh, PA, Columbia Casualty Company,
Continental Insurance Company, in its own right
and as successor in interest to certain policies
issued by Harbor Insurance Company, and
as successor by merger to Fidelity & Casualty
Company of New York and Federal Insurance
Company, Plaintiffs,

v.

APPLETON PAPERS INC., Defendant-Respondent.

Court of Appeals

*No. 2009AP286. Submitted on briefs January 5, 2010.
—Decided June 8, 2010.*

2010 WI App 86

(Also reported in 787 N.W.2d 894.)

120

124

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *John C. Heugel* of Green Bay and *Kevin J. Kuhn* of *Vedder Price, P.C.* of Chicago, IL.

On behalf of the plaintiffs, the cause was submitted on the joint briefs of *Michael J. Cohen* and *Thomas M. Hruz* of *Meissner Tierney Fisher & Nichols, S.C.* of Milwaukee, *Duffy Dillon* and *Kim M. Olson* of *Brennan, Steil & Basting, S.C.* of Janesville and *Jan M. Michaels, Scott M. Salerno* of *Michaels & May, P.C.* of Chicago, IL, *Anne Berleman Kearney* of *Appellate Consulting Group* of Milwaukee, *Margaret J. Orbon* and *Mark D. Paulson* of *Clausen Miller P.C.* of Chicago, IL and *John C. Heugel* of Green Bay and *Kevin J. Kuhn* of *Vedder Price, P.C.* of Chicago, IL.

On behalf of the defendant-respondent, the cause was submitted on the briefs of *Ronald R. Ragatz, Dennis P. Birke, Megan A. Senatori* and *Bradley C. Fulton* of

*DeWitt Ross & Stevens, S.C.* of Madison and *Randy Parr* of *Dickstein Shapiro LLP* of New York, NY and *Michael T. Sharkey, Andrew M. Weiner* and *Paul L. Spackman* of *Dickstein Shapiro LLP* of Washington, DC.

An amicus curiae brief was filed by *Robert C. Burrell* of *Borgelt, Powell, Peterson & Frauen, S.C.* of Milwaukee, *Laura A. Foggan* and *Parker J. Lavin* of *Wiley Rein LLP* of Washington, DC for *the Complex Insurance Claims Litigation Association and the Wisconsin Insurance Alliance.*

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. KESSLER, J. Westport Insurance Corporation is one of numerous insurance companies that issued commercial general liability excess insurance policies to Appleton Papers, Inc. (API), from June 30, 1978, through December 31, 1985. Westport and several insurers listed above (collectively, "Insurers") jointly appealed from a judgment declaring that: (1) their policies provide coverage for API's liability for costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) arising out of contamination from polychlorinated biphenyls (PCBs) in the Lower Fox River and Green Bay;[1] and (2) "[n]o defenses exist under the insurance policies at issue that operate to bar or limit coverage for API's liability" for those costs.[2] The Insurers also appealed from the trial

---

[1] References to Green Bay are to the bay itself, rather than to the City of Green Bay.

[2] At the outset, we would like to commend all of the parties and the amicus curiae for their thorough briefs in this case. As the Insurers noted, this is a case of "extraordinary magnitude" that was addressed over the course of four years, creating over thirty boxes of documents, pleadings and transcripts. The

128

court's order allocating indemnity responsibility among the various excess policies.[3]

¶ 2. Westport separately appealed from the denial of its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. This appeal is based on Westport's policy language concerning maintenance of underlying umbrella policies and exhaustion of underlying policies.

¶ 3. While both appeals were pending, all remaining Insurers except Westport settled their disputes with API. Westport, however, adopted all arguments made by the Insurers in their joint brief, and it separately argued the two issues unique to the terms of its policy in its own brief. We therefore resolve both the issues raised by the Insurers jointly and Westport's separate issues. For ease of reference, despite the settlement, we continue to refer to those arguments addressed in the Insurers' joint brief as the Insurers' arguments, and we refer to those arguments addressed in Westport's own brief as Westport's arguments.

¶ 4. We affirm on all issues. Further, the stay of the trial court proceedings concerning API's petition for payments pursuant to the insurance policies is lifted upon remittitur.

---

parties' attention to detail, including extensive use of citations to the record, is greatly appreciated. We also would like to acknowledge the extraordinary work done by the Hon. Donald R. Zuidmulder, who presided over the case.

[3] The Insurers also appealed from that portion of the judgment retaining jurisdiction to enforce the judgment as claims are made and attachment points of specific policies are reached. By order dated April 9, 2009, this court stayed that portion of the judgment which allowed the trial court to retain jurisdiction to enforce the judgment, pending resolution of this appeal.

## BACKGROUND

## I. Legal background: applicable federal law.[4]

¶ 5. In 1980, the federal government adopted CER-
CLA, also known as "Superfund" legislation, to promote
the cleanup of hazardous waste. *See* 42 U.S.C. § 9601, *et
seq.* Pursuant to CERCLA, as amended by the Superfund
Amendments and Reauthorization Act of 1986 ("SARA"),
the President of the United States has "broad power to
command government agencies and private parties to
clean up hazardous waste sites." *Key Tronic Corp. v.
United States*, 511 U.S. 809, 814 (1994). *Key Tronic*
explained:

> Sections 104 and 106 [of CERCLA] provide the frame-
> work for federal abatement and enforcement actions
> that the President, the [Environmental Protection
> Agency] as his delegated agent, or the Attorney General
> initiates. 42 U.S.C. §§ 9604, 9606. These actions typi-
> cally require private parties to incur substantial costs
> in removing hazardous wastes and responding to haz-
> ardous conditions. Section 107 sets forth the scope of
> the liabilities that may be imposed on private parties
> and the defenses that they may assert. 42 U.S.C. § 9607.

---

[4] Because certain aspects of CERCLA are relevant to various
issues raised in this appeal, we summarize those general provi-
sions of the federal statute. We do not interpret CERCLA, as
Congress has mandated that the United States district courts
have exclusive original jurisdiction over all controversies arising
under CERCLA. *See* 42 U.S.C. § 9613(b). The trial court here
implicitly recognized the exclusive federal jurisdiction when
ruling on various motions in limine, noting: "The nature of
API's liability under CERCLA in the underlying matter is not
ripe for determination by this Court . . . . Insurers, upon assum-
ing the duty to defend, may challenge a CERCLA order. This case
does not preclude the Insurers from litigating API's CERCLA
liability in federal courts."

*Key Tronic*, 511 U.S. at 814. Acting pursuant to CER-CLA, the Environmental Protection Agency ("EPA") can require immediate cleanup and remediation of sites containing hazardous substance contamination, without the possibility of delay caused by litigation with the government about who is ultimately responsible for all or part of the contamination.

¶ 6. Pursuant to 42 U.S.C. § 9607(a), a number of persons and entities may be "potentially responsible parties" (PRPs) liable for cleanup and remediation at a given site. As relevant to these proceedings, PRPs can include: (1) present owners and operators of the site; and (2) past owners and operators of the site. *See id.* Per 42 U.S.C. § 9622(a), the government is authorized, but is not required, to negotiate with identified PRPs to agree to a remediation plan and its method of implementation. If the government decides to negotiate, it must identify and notify all PRPs and must provide them with information about the hazardous substances at the site. *See* § 9622(e)(1).

¶ 7. The EPA may compel PRPs to act by issuing an administrative order requiring PRPs to take specified action to abate what it determines may be "an imminent and substantial endangerment" caused by the actual or threatened release of a hazardous substance. *See* 42 U.S.C. § 9606(a). These orders are referred to by the parties and in this decision as "Section 106 Orders."[5] Congress established substantial penalties for failing to comply with Section 106 Orders, stating: "Any person who, without sufficient cause . . . fails or refuses to comply with, any order of the President under subsection (a) of this section may . . . be fined not more than

---

[5] Section 106 refers to § 106 of CERCLA, which can be found at 42 U.S.C. § 9606.

$25,000 for each day in which ... such failure to comply continues." Sec. 9606(b)(1). PRPs who fail to comply with a Section 106 Order face the additional statutory consequences of being "liable to the United States for punitive damages" if they fail "without sufficient cause to properly provide removal or remedial action upon order of the President." *See* 42 U.S.C. § 9607(c)(3). The punitive damages may be "at least equal to, and not more than three times, the amount of any costs incurred by the [Superf]und as a result of such failure to take proper action." *Id.*

¶ 8. PRPs who believe they are not legally responsible, but nonetheless perform the remediation required by the Section 106 Order, may seek reimbursement from the Superfund for "the reasonable costs of such action, plus interest." 42 U.S.C. § 9606(b)(2)(A). This reimbursement is only available to PRPs who can establish "by a preponderance of the evidence that [they are] not liable for response costs under section 9607(a)" and that the remediation costs the PRPs incurred were reasonable. Sec. 9606(b)(2)(C). Even PRPs who are legally responsible for remediation can seek reimbursement from the Superfund for any portion of the remediation order that is "found to be arbitrary and capricious or otherwise not in accordance with law." *See* § 9606(b)(2)(D).

¶ 9. Federal courts are the *only* courts with subject matter jurisdiction under CERCLA, *see* 42 U.S.C. § 9613(b), and there is no right of judicial review of the EPA's selection and implementation of the particular response method until after the response has been completed and the EPA sues to recover costs under 42 U.S.C. § 9606. *See United States v. Outboard Marine Corp.*, 789 F.2d 497, 505–06 (7th Cir. 1986).

## II. Factual background.

¶ 10. According to the Section 106 Order issued by the EPA,[6] "[b]etween at least 1954 and 1971," the National Cash Register Company (hereafter "NCR," the name by which it is now known) sold carbonless copy paper, which was manufactured by the Appleton Coated Paper Company using an emulsion that contained PCBs.[7] Those PCBs were "released from paper production mills either directly to the Fox River, or indirectly, after passing through publicly-owned wastewater treatment plants." Ultimately the PCBs found their way into sediment in the Lower Fox River and Green Bay.

¶ 11. In 1970, NCR acquired the Appleton Coated Paper Company, which eventually became part of the Appleton Papers Division of NCR. In 1978, API purchased the "assets, properties and business" of NCR's Appleton Paper Division.[8] The 1978 "Agreement of Purchase and Sale of Assets" (hereafter, "1978 Sale Agreement") stated in relevant part:

Purchaser [API[9]] agrees that it shall assume, pay,

---

[6] The background facts are taken from the Section 106 Order, the parties' briefs and numerous exhibits. This information is provided for background purposes only; we make no attempt to highlight and resolve potential factual disputes.

[7] In October 1976, Congress passed the Toxic Substances Control Act, which singled out PCBs as a hazardous substance and required the EPA to prescribe rules restricting their manufacture, use and disposal. *See* Pub. L. No. 94–469, 90 Stat. 2003 (1976) (codified at 15 U.S.C. § 2601, *et seq.*).

[8] There were numerous corporate acquisitions and mergers involving NCR, API and the Appleton Papers Division in the years prior to 1978. We do not attempt to summarize those transactions here.

[9] The 1978 Sale Agreement identifies the purchaser as Lentheric, Inc., which changed its name to API.

perform, defend and discharge . . . all of the following:

. . . .

. . . [A]ll of Seller's [NCR's] liabilities . . . whether arising from transactions, events or conditions occurring prior to or after the Closing Date, with respect to compliance of the Property . . . or operations of [the facilities] with all applicable . . . governmental environmental and pollution control laws.[10]

The 1978 Sale Agreement indicated that NCR had "not received any notice from any governmental body" that the operations being sold "currently violate any environmental . . . law, ordinance, regulation, rule or standard."[11] The 1978 Sale Agreement also contained reciprocal indemnification agreements by NCR and API.

¶ 12. After the 1978 sale, API continued to operate the facilities that NCR had previously operated. API did not use PCBs in any of its manufacturing processes.

---

[10] In the face of API's broad contractual assumption of various NCR liabilities prior to purchase of the insurance policies disputed here, it is curious that the Insurers rely on *North Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642 (7th Cir. 1998), *overruled on another ground by Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 986 n.1 (7th Cir. 2010), for the "*general rule* under CERCLA . . . 'that an asset purchaser . . . does not acquire the liabilities of the seller.' " (Quoting *North Shore Gas*, 152 F.3d at 651; emphasis added; second set of ellipses in original.) As *North Shore Gas* explains, one exception to that general rule applies when "the purchaser expressly or impliedly agrees to assume the liabilities." *See id.* Here, the 1978 Sale Agreement makes it clear that API agreed to assume a variety of NCR liabilities, thus abrogating any "general rule" under CERCLA that might apply if API in fact purchased only assets without assuming any NCR liabilities.

[11] The 1978 Sale Agreement identified numerous potential claims against NCR, but none of those claims related to claims at issue here.

¶ 13. In 1994, NCR and five other companies were notified that they were PRPs under CERCLA.[12] API was not included in the notice, but NCR notified API that NCR had been identified as a PRP and demanded that API defend and indemnify it pursuant to the 1978 Sale Agreement.

¶ 14. One year later, in June 1995, NCR sued API in federal court, seeking indemnification for its potential liabilities based on the 1978 Sale Agreement (hereafter, "1995 NCR Litigation"). API denied assuming liability for PCB contamination under the 1978 Sale Agreement and filed a cross-claim. Each company claimed that under the 1978 Sale Agreement, the other party was required to indemnify all costs of pollution remediation.

¶ 15. In January 1997, the trial court presiding over the 1995 NCR Litigation concluded that the 1978 Sale Agreement was ambiguous and denied both parties' motions for summary judgment. In July 1997, the EPA notified both API and NCR that under CERCLA, each was a PRP for remediation of the PCBs deposited in the sediment of the Lower Fox River and Green Bay.

¶ 16. At the time API was notified that it was a PRP, the relevant law in Wisconsin relating to insurance coverage for environmental remediation costs was described in *City of Edgerton v. General Casualty Co.*, 184 Wis. 2d 750, 517 N.W.2d 463 (1994), *overruled by Johnson Controls, Inc. v. Employers Ins. of Wausau*, 2003 WI 108, 264 Wis. 2d 60, 665 N.W.2d 257. Under the terms of the commercial general liability ("CGL") policy reviewed in *Edgerton*, our supreme court concluded

---

[12] NCR is not a party to this case and its insurance coverage and potential liability under CERCLA are not addressed in this appeal.

that a PRP letter was *not* the equivalent of a suit. *Id.* at 758 (holding that the letters notifying city and company that they "were potentially responsible parties and liable for hazardous waste site remediation costs does not trigger the insurers' duty to defend because the letters do not constitute a 'suit seeking damages' within the plain meaning of the insurance policies"). Further, the court held that the costs of remediation/cleanup of property required by the EPA were *not* damages. *See id.* at 782 ("[T]he CGL policies in this case do not provide coverage for Superfund response costs, since such costs do not constitute damages.").

¶ 17. Having been notified that they were both PRPs, API and NCR agreed to mediate the indemnification dispute. As a result of mediation in 1998, NCR and API reached an agreement ("1998 Settlement Agreement"). Pursuant to the 1998 Settlement Agreement, they agreed as follows: "If any costs or damages were incurred in the future with respect to [PCB contamination of the Lower Fox River], API and NCR would split the first $75,000,000 of [remediation] costs, with API paying 55% and NCR paying 45%." The 1998 Settlement Agreement also bound the parties to arbitration "before a panel of three lawyers with expertise in environmental law" to determine "the parties' respective shares" if more than $75 million in costs were incurred.

¶ 18. In August 1998, API sent letters to its excess insurance carriers (including, among others, the Insurers in this appeal) notifying them that it had received the PRP notice and a request from the EPA to negotiate a remediation plan and implementation method. API asked its excess carriers to defend it, pursuant to the existing policies. It is undisputed that none of the insurers acknowledged coverage or participated in API's defense. For instance, insurer AIG ac-

knowledged the tender notice, noted that as an excess carrier it was not obliged to pay anything until underlying coverage was exhausted and reserved its rights and defenses. AIG also stated that it considered API's "notice to be precautionary" and that it was not aware of any information indicating that API's underlying coverage was exhausted or nearing exhaustion.

¶ 19. API continued to periodically send updates on the remediation process to its excess carriers. The Insurers took no action. In September 1999, API advised the Insurers that the current budget for the remediation was $24 million. The Insurers took no action. Some claims handlers concluded that API's claims would not reach the attachment points of their policies,[13] and some also concluded that API's claims were not covered because of Wisconsin law.

¶ 20. In 2000, API and NCR began negotiating an interim consent decree with the EPA and the Wisconsin Department of Natural Resources ("DNR"). API updated the Insurers concerning the status of the negotiations and its intent to enter into a consent decree, and it invited objections. No Insurer objected. A consent decree was entered in December 2001, pursuant to

---

[13] The term "attachment point" used in reference to excess liability policies refers to the "amount in covered claims that must be paid by underlying primary and excess insurers before the insurer's obligation to pay arises." John F. O'Connor, *Insurance Coverage Settlements and the Rights of Excess Insurers,* 62 MD. L. REV. 30, 39 (2003) (citing *Household Int'l, Inc. v. Liberty Mut. Ins. Co.,* 749 N.E.2d 1, 12 (Ill. App. Ct. 2001) (explaining that "an excess policy with an 'attachment point' of $51 million in excess of underlying coverage will not be implicated until the insured has exhausted $51 million in lower-level coverage").

which API and NCR paid a total of $41.5 million over the next four years toward their liability for the Lower Fox River cleanup.

¶ 21. The legal assessments underlying the Insurer's actions took a dramatic turn on July 11, 2003. Controlling law changed when the Wisconsin Supreme Court overruled its earlier *Edgerton* decision with respect to coverage for remediation and the duty to defend, thereby negating an important legal foundation of the Insurers' legal analysis of coverage. *See Johnson Controls*, 264 Wis. 2d 60, ¶ 4.[14]

¶ 22. In *Johnson Controls*, the court first explained why it was abandoning *Edgerton*:

> Today the problems created by the *Edgerton* decision have become so obvious and so acute that they cannot be ignored. The court is convinced that we did not correctly analyze the term "damages" in the standard CGL policy in relation to environmental cleanup costs under CERCLA. We relied too heavily on a previous decision of this court involving very different facts and laws. We also created an unworkable interpretation of the insurer's duty to defend in the specialized context of CERCLA letters and orders. The process of restoring consistency and coherence to the law must begin by overruling the *Edgerton* decision.

*Johnson Controls*, 264 Wis. 2d 60, ¶ 4. The court held that receipt of a PRP letter pursuant to CERCLA begins the adversarial process and triggers the insurer's duty to defend. *Id.*, ¶ 5. In addition, the court concluded that CERCLA response costs *are* "damages" under the CGL policies, unless specifically excluded under the policy. *Id.* The court explained:

---

[14] Many insurance companies involved in the *Johnson Controls* litigation were also involved in the instant litigation.

> We hold that an insured's costs of restoring and remediating damaged property, whether the costs are based on remediation efforts by a third party (including the government) or are incurred directly by the insured, are covered damages under applicable CGL policies, provided that other policy exclusions do not apply. We also conclude that receipt of a potentially responsible party (PRP) letter from the EPA or an equivalent state agency, in the CERCLA context, marks the beginning of adversarial administrative legal proceedings that seek to impose liability upon an insured. A PRP letter significantly affects legal interests of the insured. Therefore, a reasonable insured would expect this letter to trigger its CGL insurer's duty to defend.

*Id.*, ¶ 5 (footnote omitted).

¶ 23. In January 2005, the Insurers filed this action seeking a declaratory judgment that API does not have any coverage under their policies. Not surprisingly, API counterclaimed, seeking a judgment declaring that API does have insurance coverage for its losses and asking for money judgments against each excess carrier whose attachment point had been reached as of the date of judgment.

¶ 24. Meanwhile, on August 15, 2005, API notified each excess carrier that arbitration between API and NCR under the 1998 Settlement Agreement was going to proceed because the $75 million threshold was going to be exceeded. The record contains no response from any Insurer. After a contested two-day arbitration hearing, the arbitrators allocated responsibility for costs in excess of the $75 million threshold as sixty percent to API and forty percent to NCR. On February 26, 2007, judgment in the 1995 NCR Litigation was entered accordingly.

¶ 25. In May 2007, the trial court considered over twenty summary judgment motions filed in this case, some of which were denied and some of which were

granted. As relevant to this appeal, the trial court denied the Insurers' motions for summary judgment concerning their voluntary-payments, after-acquired-liability, late-notice and known-loss defenses. Subsequently, the trial court dismissed the Insurers' expected and intended defense, with prejudice.

¶ 26. In November 2007, the EPA issued a Section 106 Order to API, NCR and six other companies. The Section 106 Order directed the named companies to remediate the sediment contamination of the Lower Fox River and Green Bay at their expense and according to the EPA's remediation plan. The named companies were advised that they were jointly and severally liable for the required remediation. Remediation proceeded.

¶ 27. Ultimately, this coverage case was tried to a jury for twenty-two days in February and March 2008.[15] Prior to trial, the trial court considered numerous motions in limine, which led it to revisit its earlier decision to deny the Insurers' motion for summary judgment concerning its voluntary-payments and after-acquired-liability defenses. Although the trial court had earlier concluded that there were disputed material facts concerning the viability of those defenses in light of API's execution of the 1978 Sale Agreement or the 1998 Settlement Agreement, it decided that those issues were no longer ripe for determination at trial. The trial court explained that at the time it considered the motions for summary judgment, it:

> totally had the mistaken belief that there was going to be the ability to get the [government] to select which

---

[15] Between the summary judgment proceedings and the jury trial there were additional proceedings concerning whether the case would be tried to a jury. We do not discuss those proceedings here.

140

theory it was [proceeding under against API] and then assuming they had selected that theory, I was reserving the right for all of this to come in because if that theory was one in which the carriers could indicate this was assumed liability . . . then I think [it would be] germane . . . .

But if the state of the record is that there is no clarity . . . then I think this coverage case goes forward . . . .

In other words, I think the theory that they are propounding . . . is not resolved in this case because it springs to life based upon the determination of a party [the federal government] that we can't compel to make that decision [identifying the basis for API's liability], and when that decision is made, the carriers may well be able to return to another forum . . . [for] another coverage fight.

¶ 28. Based on that decision, the trial court issued a written order that granted API's motion in limine to bar the Insurers from presenting evidence or arguing that API's liability arises out of either the 1978 Sale Agreement or the 1998 Settlement Agreement. As a result of this ruling, the Insurers' defenses concerning voluntary payments and after-acquired liability were not presented to the jury.

¶ 29. At the conclusion of the trial testimony, the trial court entered a directed verdict for API on the Insurers' "known loss" defense. The special verdict submitted to the jury contained three sets of questions relevant to this appeal:[16] (1) whether the PCB contamination was "unexpected and unintended by API and,

---

[16] The jury was also asked questions about alleged misrepresentations by API with respect to a particular insurance policy. The jury found no misrepresentation and the affected insurer has not appealed that determination.

thus, an 'occurrence' under the policies"; (2) whether there was "property damage" under the policies during each particular year; and (3) whether API's August 1998 notice to the Insurers was too late, and, if so, whether the Insurers were prejudiced. The trial court answered the first question for the jury, answering "yes." With respect to questions two and three, the jury found that there had been property damage in each year between June 30, 1978, and December 31, 1985, and that API's notice was not late.

¶ 30. Numerous post-trial motions were filed. As relevant to this appeal, the trial court considered the Insurers' renewed motions for summary judgment with respect to the voluntary-payments and after-acquired-liability defenses. At the motion hearing, the trial court *sua sponte* granted summary judgment in API's favor on those defenses. The written order memorializing the summary judgment stated:

> A. API's liability arises from its designation by the government as a [PRP] under CERCLA and confirmed by the [Section] 106 Order.
>
> B. By virtue of the jury's verdict in this matter, API's liability under CERCLA is covered under all of the insurance policies at issue.
>
> C. API was named a [PRP], and based upon the [Section] 106 Order, API is jointly and severally liable under CERCLA for all Fox River cleanup costs.
>
> D. API entered into the 1998 [Settlement] Agreement with NCR after API had been named a [PRP].
>
> THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:
>
> . . . .
>
> Summary judgment is GRANTED to API *sua*

142

*sponte* that any voluntary payments and after-acquired liability defenses asserted by the insurers have no applicability to API's claim for coverage for API's liability under CERCLA.

¶ 31. Another post-trial matter concerned how to apply the determination that the 1978–85 insurance policies are jointly and severally liable for "all sums" that API has to pay under CERCLA. The trial court invoked Wis. Stat. § 806.04(8) (2007–08)[17] to administer the case, and indicated in the judgment that it would retain jurisdiction "to enforce its declaration of coverage and to receive and adjudge petitions from the parties to enforce this judgment." With respect to allocation, the trial court rejected the Insurers' suggestion that there be "horizontal exhaustion" of the policies and instead concluded that vertical exhaustion was appropriate, holding as follows:

A. The "all sums" language of the insurance policies at issue permits API to select triggered policies in a particular year to respond first to API's CERCLA liability.

B. The vertical, by-year method of selecting policies is a simpler method for the Court to manage settlements and setoffs than a horizontal method.

C. The vertical, by-year method of selecting policies is more consistent with the expectation of the parties at the time the insurance was sold than a horizontal method.

D. There is nothing in the way the insurance industry operates to suggest that policyholders would access triggered policies in a horizontal way.

[17] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

E. API's prior settlements of insurance policies in various years have no bearing on API's right now to select triggered policies on a vertical, by-year basis.

¶ 32. The trial court granted judgment in API's favor, declaring that all of the named policies "provide coverage for API's liability under CERCLA arising out of [PCB] contamination in the Lower Fox River and Green Bay" and that "no defenses exist under the insurance policies . . . that operate to bar or limit coverage for API's liability under CERCLA arising out of PCB contamination in the Lower Fox River and Green Bay."

¶ 33. The trial court also ruled that API could petition the court to order the Insurers to pay remediation costs consistent with the trial court's allocation ruling. The trial court based this decision on WIS. STAT. § 806.04(8), which provides that "[f]urther relief based on a declaratory judgment or decree may be granted whenever necessary or proper." However, the trial court did not consider the merits of API's petition for costs because settlements it had already received had fully covered remediation costs to date. It directed API to file a petition for costs in the future and, in the written judgment, explicitly "retain[ed] jurisdiction, including during the appeal of this matter, to enforce its declaration of coverage and to receive and adjudge petitions from the parties to enforce this judgment."

¶ 34. The Insurers filed both a notice of appeal and a petition for leave to appeal, based on uncertainty concerning whether the judgment was final, given the trial court's retention of jurisdiction to consider petitions for costs. The Insurers also sought to stay further proceedings in the trial court pending completion of the appeal. By order dated April 9, 2009, this court declined

to determine whether the judgment was final for purposes of appeal and granted the petition for leave to appeal. We also granted the motion for a stay. This appeal follows. The Insurers' myriad issues are addressed in Part I of the Discussion section of this opinion.

¶ 35. Westport has filed an individual appeal of an order denying its "motion for judgment notwithstanding the verdict or, in the alternative, for a new trial on the issues of maintenance of underlying umbrellas and exhaustion of underlying policies." We consider that appeal in Part II of the Discussion section of this opinion.

## LEGAL STANDARDS

¶ 36. At issue in this case is insurance coverage for CERCLA liability. Resolution of this case requires us to interpret numerous CGL insurance policies. In doing so, we recognize that:

[a]n insurance policy is construed to give effect to the intent of the parties, expressed in the language of the policy itself, which we interpret as a reasonable person in the position of the insured would understand it. The words of an insurance policy are given their common and ordinary meaning . . . [and] the court may also consider the purpose and subject matter of the insurance.

*Danbeck v. American Family Mut. Ins. Co.*, 2001 WI 91, ¶ 10, 245 Wis. 2d 186, 629 N.W.2d 150 (citations omitted). "The interpretation of words or clauses in an insurance contract is a question of law that we review de novo." *Johnson Controls*, 264 Wis. 2d 60, ¶ 30. *Johnson Controls* summarized the method Wisconsin courts use to determine whether an insurance contract requires coverage of a particular claim:

"In general, the interpretation of an insurance contract is controlled by principles of contract construction. The primary objective in interpreting a contract is to ascertain and carry out the intentions of the parties. Of primary importance is that the language of an insurance policy should be interpreted to mean what a reasonable person in the position of the insured would have understood the words to mean."

*Id.* (citations and one set of quotation marks omitted). Additional legal standards applicable in this case will be discussed within the Discussion section.

## DISCUSSION

¶ 37. This appeal concerns issues raised by the Insurers jointly and by Westport on its own behalf. The Insurers present four arguments: (1) with respect to their defenses based on voluntary payments and after-acquired liability, the Insurers were entitled to summary judgment or, at a minimum, should have been permitted to present those defenses to the jury; (2) with respect to their late-notice defense, the trial court erroneously precluded the Insurers from presenting "key late-notice evidence" and erroneously instructed the jury; (3) with respect to their late-notice, known-loss and expected-or-intended defenses, the trial court imposed an erroneous foundational requirement that resulted in the erroneous exclusion of highly probative evidence and the eventual entry of a directed verdict against the insurers; and (4) the trial court's post-trial decision determining how to allocate indemnity responsibility to API among the various policies was incorrect because it failed to apply horizontal exhaustion, failed "to reduce the available limits under each policy by amounts due under prior policies" and decided the

damages due in a post-trial show-cause hearing. (Capitalization omitted.)

¶ 38. In addition to joining the aforementioned arguments, Westport also presents two individual issues, arguing that the trial court erroneously denied Westport's motion for judgment notwithstanding the verdict because API failed to prove that: (1) "the underlying umbrella insurers have actually paid, or have been held liable to pay, their full policy limits"; and (2) API "complied with the maintenance of [the] underlying umbrella clause of the Westport policy." (Some capitalization omitted.)

¶ 39. We consider each set of issues in turn.

## I. Insurers' joint appeal.

### A. Voluntary-payments and after-acquired-liability defenses.

¶ 40. As discussed, the trial court ultimately granted summary judgment in API's favor, concluding "that any voluntary payments and after-acquired-liability defenses asserted by the insurers have no applicability to API's claim for coverage for API's liability under CERCLA." On appeal, the Insurers argue that they were entitled to summary judgment with respect to the applicability of their voluntary-payments and after-acquired-liability defenses. At a minimum, they assert, they were entitled to present those defenses to the jury. They argue:

> API's liability for the Lower Fox River is not covered because it assumed that liability without notice to or the consent of the [Insurers], and after the Policies had expired . . . .

147

The [trial] court denied summary judgment to the [Insurers] because it perceived a fact question concerning whether and to what extent API's Fox River liability arose from the 1998 Settlement with NCR. It then denied the [Insurers] the opportunity to present this very fact question to the jury. The court concluded that the question was not part of this case, since it had limited the case to an unestablished premise: that API is liable under CERCLA on a basis other than its assumption of NCR's Fox River liability. In all events, the [Insurers] were entitled to contest that premise— i.e., to *try* the basis for API's Fox River liability.

The [trial] court's rulings . . . were erroneous. The voluntary-payments and after-acquired-liability defenses were part of this case. The [Insurers] were entitled to summary judgment based on these defenses because the 1998 Settlement *is the sole basis for API's liability (under CERCLA or otherwise) for the PCB contamination.* Indeed, API was required to show that the liability for which it seeks coverage arose from some basis other than the 1998 Settlement. By failing to do so, API failed to establish coverage as a matter of law. At a minimum, any disputed facts relevant to the defenses should have gone to the jury.

We are not convinced.

¶ 41. When reviewing the grant or denial of a summary judgment, we apply the same methodology as the trial court and review *de novo* the grant or denial of summary judgment. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). Summary judgment is proper if there are no genuine issues of material fact and one party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). Applying these standards, we conclude that there are no genuine issues of material fact and that API was entitled to summary judgment with respect to the Insurers' voluntary-payments and after-acquired-liability defenses.

¶ 42. We begin with the Insurers' assertion that the "1998 Settlement is the sole basis for API's liability (under CERCLA or otherwise) for the PCB contamination."[18] (Emphasis omitted.) This is a breathtaking assertion, in light of the relevant CERCLA provisions and case law, and we reject it.

¶ 43. As noted, 42 U.S.C. § 9607(a) provides that PRPs can include: (1) present owners and operators of the site; and (2) past owners and operators of the site. Consistent with CERCLA, the Section 106 Order in this case states that API:

> is liable for payment of response costs and performance of response activities at the Site because API is: (1) a successor to one or more corporate predecessors that, at the time of disposal of hazardous substances, owned and/or operated a facility at which such hazardous substances were disposed of, and from which there has been a release of hazardous substances to the Site; and (2) a successor to one or more corporate predecessors that by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances at a facility owned or operated by another party or entity and from which there has been a release of hazardous substances to the Site.

The Section 106 Order does not mention the 1978 Sale Agreement or the 1998 Settlement Agreement.

---

[18] Earlier in the litigation, the Insurers framed their arguments in terms of both the 1978 Sale Agreement and the 1998 Settlement Agreement. However, shortly before trial, the Insurers asserted that API's obligations under the 1978 Sale Agreement were "novated" or "[e]ssentially . . . supplanted" by the 1998 Settlement Agreement. Thus, their subsequent arguments, including on appeal, have focused on the obligations API assumed pursuant to the 1998 Settlement Agreement.

¶ 44. API is subject to the Section 106 Order. Ultimately, API may challenge its liability for remediation costs and could ask a federal court to refund some or all of its contributions to the cleanup. *See* 42 U.S.C. § 9606(b)(2)(A). But unless and until a federal court decides API is not liable for remediation costs, the Section 106 Order remains in effect and API is jointly and severally liable for the costs of remediation. *See* 42 U.S.C. § 9606. Under the terms of the Section 106 Order, API's liability is based on CERCLA; we lack jurisdiction to determine otherwise. *See* 42 U.S.C. § 9613(b) (district courts have exclusive original jurisdiction over all controversies arising under CERCLA).

¶ 45. The Insurers assert that the insurance policies do not cover any payments API is required to make pursuant to the 1998 Settlement Agreement. Like the trial court, we decline to speculate on whether API could have CERCLA liability based on the 1998 Settlement Agreement and, if so, whether the Insurers' voluntary-payments and after-acquired-liability defenses would bar coverage for those costs. At this time, API is paying remediation costs pursuant to the Section 106 Order—an order that indicates API is liable as a successor to corporate predecessors that polluted the Lower Fox River and Green Bay and does not even hint that API may be liable based on the 1998 Settlement Agreement.

¶ 46. The Insurers have not identified any facts that require resolution before the coverage issues presented in this case, at this time, can be determined. For the foregoing reasons, we affirm the trial court's grant of summary judgment in API's favor concerning the Insurers' voluntary-payments and after-acquired-liability defenses.

## B. Late-notice defense.

¶ 47. The Insurers argue, with respect to their late-notice defense, that the trial court erroneously precluded the Insurers from presenting "key late-notice evidence" and erroneously instructed the jury. We reject both of these arguments.

### 1. Restrictions on the introduction of late-notice evidence.

¶ 48. The Insurers argue that the trial court erroneously precluded relevant evidence regarding the 1995 NCR Litigation and the 1998 Settlement Agreement. We have recognized that a trial court " 'has broad discretion in determining the relevance and admissibility of proffered evidence.' " *State v. Oberlander*, 149 Wis. 2d 132, 140, 438 N.W.2d 580 (1989) (citation omitted). We review a trial court's decision to admit or exclude evidence using the erroneous exercise of discretion standard. *State v. Walters*, 2004 WI 18, ¶ 13, 269 Wis. 2d 142, 675 N.W.2d 778. "An appellate court will uphold an evidentiary ruling if it concludes that the [trial] court examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *Id.*, ¶ 14. Therefore, this court will not find an erroneous exercise of discretion if there is a reasonable basis for the trial court's determination. *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983).

¶ 49. Not all errors concerning the admission of evidence justify a new trial. In *Martindale v. Ripp*, 2001 WI 113, 246 Wis. 2d 67, 629 N.W.2d 698, the court explained:

An erroneous exercise of discretion in admitting or excluding evidence does not necessarily lead to a new trial. The appellate court must conduct a harmless error analysis to determine whether the error "affected the substantial rights of the party." If the error did not affect the substantial rights of the party, the error is considered harmless.

*Id.*, ¶ 30. "The substantial rights of the parties are affected only if there is a reasonable possibility that the error contributed to the outcome of the case." *Estate of Hegarty v. Beauchaine,* 2006 WI App 248, ¶ 152, 297 Wis. 2d 70, 727 N.W.2d 857; *see also* WIS. STAT. §§ 805.18 and 901.03. "If the error at issue is not sufficient to undermine the reviewing court's confidence in the outcome of the proceeding, the error is harmless." *Evelyn C.R. v. Tykila S.,* 2001 WI 110, ¶ 28, 246 Wis. 2d 1, 629 N.W.2d 768.

¶ 50. The Insurers assert that they should have been able to show the 1998 Settlement Agreement to the jury, present the content of NCR's complaint in the 1995 NCR Litigation and question certain witnesses in detail about the content of the 1998 Settlement Agreement. They state that if permitted, they would have demonstrated that: (1) API knew upon receiving the complaint in the 1995 NCR Litigation that it potentially faced substantial liability for PCB contamination; (2) API had negotiated the 1998 Settlement Agreement and thereby "agreed to assume a significant share of API's and NCR's joint . . . liabilities long before API provided notice to the" Insurers; and (3) API and NCR understood that they were likely liable for many millions of dollars for the PCB contamination.

¶ 51. We are not convinced that the trial court erroneously exercised its discretion when it limited the

evidence presented to the jury. The trial court permitted considerable and substantial evidence about NCR's 1995 federal lawsuit and about the 1998 Settlement Agreement. The jury was aware, from testimony by expert witnesses from both sides, that:

- API bought manufacturing facilities from NCR under the 1978 Sales Agreement, in which API assumed certain environmental liabilities.

- NCR sued API in 1995 seeking a declaration that under the 1978 Sales Agreement, API was obligated to indemnify NCR for costs estimated to be as high as $100 million.

- In February, 1998, before API gave notice to the Insurers, the NCR lawsuit was settled.

- NCR and API, in the 1998 Settlement Agreement, agreed to split the first $75 million in environmental costs if any were incurred. They also agreed that the split of any costs in excess of that amount would be determined by binding arbitration.

- In 2005, NCR and API went to arbitration. The arbitrators allocated a larger share of the Lower Fox River cleanup costs to API than API had agreed to in the 1998 Settlement Agreement.

This information was also a focus of the Insurers' closing argument.

¶ 52. Thus, the trial court permitted the jury to hear about the existence of the 1995 NCR Litigation and the subsequent 1998 Settlement Agreement because it was relevant to a discussion of late notice. However, the trial court was understandably concerned about creating a trial within a trial. It noted: "I do not want a trial within a trial as to who was right between NCR and API. The jury knows this is what was going on." We cannot conclude that this constituted an erroneous exercise of discretion. Preventing the Insurers

from displaying or providing to the jury either the complaint from the 1995 NCR Litigation or the 1998 Settlement Agreement was a reasonable exercise of the trial court's discretion to avoid jury confusion, the waste of time that accompanies the presentation of cumulative evidence or unnecessary trials within a trial. The record confirms that the trial court balanced the relevance of proffered additional evidence against the factors described in WIS. STAT. § 904.03, and reached a conclusion with a reasonable basis in the record. That is properly exercised discretion.

¶ 53. We are hard-pressed to understand why or how the jury verdict would have probably been different on the late-notice question if the jury had been handed the entire text of the complaint in the 1995 NCR Litigation or the voluminous 1998 Settlement Agreement. To provide the jury with these documents would result in twelve laymen attempting to discern the legal meaning of complex legal documents about which a courtroom full of lawyers did not agree, and could result in the consideration of issues not relevant to the Insurers' late-notice defense. The jury was provided with ample information about these documents, limited to the extent the documents were relevant to when API was required to give notice under its policies. We affirm the trial court's discretionary decision limiting the use of this cumulative and confusing evidence.

### 2. Jury instructions on late notice.

¶ 54. The Insurers argue that the trial court's jury instructions on late notice were erroneous in numerous ways, each of which we address below. Our supreme court has summarized the applicable standard of review when evaluating the sufficiency of a trial court's jury instructions:

Generally, a trial court has broad discretion when instructing a jury. If the jury instructions fully and fairly explain the relevant law, there are no grounds for reversal. The question of whether the jury instructions accurately state the law is a question of law, which we review de novo.

If the jury instructions were an erroneous statement of the law, a new trial will be ordered only if the court's error affected the substantial rights of the party. An error affects the substantial rights of the party if it undermines confidence in the outcome. An error undermines confidence in the outcome if there is a reasonable probability the outcome would have been different but for the error.

*Horst v. Deere & Co.*, 2009 WI 75, ¶¶ 17–18, 319 Wis. 2d 147, 769 N.W.2d 536 (citations, internal quotation marks and footnote omitted).

¶ 55. We begin by noting that the jury instructions in this case were created after consideration of extensive proposed instructions, briefs from numerous parties and a two-day instructions conference. Ultimately, the trial court drafted its own instruction on late notice that differed materially from the proposed instructions. As relevant to this appeal, the trial court instructed the jury as follows:

[N]otwithstanding the slight differences in the language from policy to policy, the notice provisions are fundamentally the same. The notice provisions require the insured to give notice:

["]Whenever the Insured has information from which the Insured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which in the event that the policyholder is held liable, is likely to involve this policy, notice shall be given as soon as practicable.["]

155

. . . .

Because the Insurers contend that API's notice was late, they bear the burden of proof on Questions 3 through 5 [of the special verdict]. To meet this burden, the Insurers must prove that API did not provide notice as soon as practicable after receipt of information from which it could reasonably conclude the following:

That there was an occurrence; []

That the occurrence involved property damage for which the Insured would be held liable; and

[T]hat the amount of damages involves the policies.

If you find that API knew all three of these elements as of the date on which the Insurers contend API should have provided notice, then you should answer this question "yes."

In order to determine whether API had knowledge of the above information, you may consider the following:

The likelihood of liability; the amount of potential damages; the likelihood that damages will reach the attachment points of the particular policies; and whether the policies provided coverage for the property damage arising from the occurrence.

. . . .

"As soon as practicable," in this connection means with reasonable dispatch and within a reasonable time in view of all the facts and circumstances of the case.

You should judge what API could "reasonably conclude" based upon what a reasonable policyholder with the same information that API had at the time would have reasonably concluded based on that same information.

(One indentation added.)

156

¶ 56. The trial court also told the jury about the change in Wisconsin Supreme Court precedent, as *Johnson Control*'s overruling of *Edgerton* allegedly affected API's actions with respect to notice. The instruction stated:

[I]n determining whether API's notice was timely, you may consider that from June 16, 1994 through July 11, 2003, Wisconsin law as established by [the] Wisconsin Supreme Court in a case called *City of Edgerton* was that "environmental response costs" were not covered by general liability policies, like the policies in this case.

"Environmental response costs" are the costs of investigating and cleaning up environmental contamination, such as the PCB contamination in the Lower Fox River and Green Bay as required by government agencies such as the Wisconsin Department of Natural Resources or the United States Environmental Protection Agency.

The *City of Edgerton* decision also held that issuance of a letter from the government either requesting or directing an insured to participate in an environmental cleanup . . . of contaminated property, such as the PRP letter, did not constitute a "suit."

On July 11, 2003, the Wisconsin Supreme Court overturned the *City of Edgerton* ruling and a new case called *Johnson Controls* changed Wisconsin law. *Johnson Controls* held that environmental response costs are covered by general liability policies like those in this suit. Additionally, *Johnson Controls* held that a PRP letter did constitute a "suit."

You may consider that the parties to this case continue to disagree . . . as to the scope of the holdings in *City of* Edgerton and *Johnson Controls.*

(Italics added.)

¶ 57. The Insurers argue that these instructions were erroneous for numerous reasons. They argue that the trial court "improperly instructed the jury that it should consider API's subjective beliefs concerning liability" and "improperly invited the jury to excuse API from providing notice if API believed that its liability was not covered." The Insurers' subjective belief argument is premised on the trial court telling the jury that the occurrence must involve "property damage for which [the insured] would be held liable" and later that it could consider "the likelihood of liability" in deciding whether API's knowledge was sufficient to require notice. Both of these elements come directly from the policy language itself.

¶ 58. The Insurers take phrases in the instructions out of context. However, we must consider whether " 'the jury instructions, as a whole, misled the jury or communicated an incorrect statement of law.' " *See D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson*, 2008 WI 126, ¶ 39, 314 Wis. 2d 560, 757 N.W.2d 803 (citation omitted). The trial court specifically explained that API's subjective belief was *not* determinative; rather, the jurors were told that they must decide "what API could 'reasonably conclude' based upon what a reasonable policyholder with the same information that API had at the time would have reasonably concluded based on that same information." We presume the jurors followed *all* of the instructions they were given. *See State v. Delgado*, 2002 WI App 38, ¶ 17, 250 Wis. 2d 689, 641 N.W.2d 490 ("Juries are presumed to follow the court's instructions."). For these reasons, we are not convinced by the Insurers' argument.

158

¶ 59. The Insurers also complain that the trial court allowed the jury to consider the evidence concerning API's alleged reliance on *Edgerton,* and the legal effect of *Edgerton* and the Wisconsin Supreme Court's later decision in *Johnson Controls* overruling *Edgerton,* on issues critical to this case. However, we have held that when a policy requires notice of "an occurrence covered hereunder" that an "insured has no duty to give an insurer notice of an uninsured occurrence." *See Leverence v. United States Fid. & Guar.,* 158 Wis. 2d 64, 74–77, 462 N.W.2d 218 (Ct. App. 1990), *overruled on other grounds by Wenke v. Gehl Co.,* 2004 WI 103, 274 Wis. 2d 220, 682 N.W.2d 405. API's reliance on *Edgerton* was relevant, because until it was overruled, API had no reason to believe the remediation costs it was paying would be covered by insurance.

¶ 60. We conclude that with this argument the Insurers seek to rewrite their policies so as to require notice, despite clear law specifically absolving the insurer from liability based on the same facts as to which they argue notice should have been given. While *Edgerton* remained the law in Wisconsin, environmental cleanup costs required by the government under CERCLA were not covered by CGL policies. Under *Edgerton,* an EPA notice to a PRP was not " 'the functional equivalent of a suit' " and environmental cleanup costs were not "damages" under such policies. *See id.,* 184 Wis. 2d at 781–82. As a result, both API and the Insurers did not consider API's remediation costs to be covered.[19]

---

[19] It is apparent that the Insurers understood the effect of *Edgerton* on their policy responsibility. For instance, after being later advised of an increase in potential cleanup costs, one claims handler wrote that "clean up cost[s] are not considered

¶ 61. The trial court created a thoughtful and careful instruction where no pattern instruction was available; the instructions properly explained a critical, but unusual legal event which reversed applicable law in the midst of the ongoing mandated environmental cleanup. That cleanup is the underlying impetus for this litigation. The jury could not have fairly decided the question of timely notice in this case without a basic understanding of the monumental change in the law that occurred while matters relevant to the question presented were ongoing. We find no error in the instructions.

■■■

¶ 62. Finally, the Insurers argue that the trial court erroneously instructed the jury with respect to whether prejudice was required in a late-notice case, and asserts that if the jury had been properly instructed, the only relevant evidence would have established prejudice. We decline to address this argument in detail because ultimately, the jury found there had been timely notice and it never considered whether the Insurers were prejudiced by late notice. Therefore, any error in the instructions was not prejudicial to the Insurers. *See Fischer v. Ganju*, 168 Wis. 2d 834, 849, 485 N.W.2d 10 (1992) ("A challenge to an allegedly erroneous jury instruction warrants reversal and a new trial only if the error was prejudicial.").

## C. Exclusion of some evidence concerning API's knowledge of PCBs.

¶ 63. The Insurers argue that they are entitled to a new trial based on the exclusion of some evidence

damages in W[isconsin], therefore the increase in potential cleanup cost[s] does not [a]ffect our position articulated in my letter dated [September 6, 2000]."

concerning API's knowledge of PCB contamination. Specifically, they contend that the trial court imposed "an erroneous foundational requirement" that resulted in the erroneous exclusion of highly probative evidence relevant to the Insurers' late-notice, known-loss and expected-or-intended defenses. They explain:

> At the outset of the [Insurers'] case-in-chief, the [trial] court created an erroneous foundational requirement that prevented [the Insurers] from presenting substantial evidence of API's knowledge on PCBs. Specifically, the court barred evidence regarding knowledge API employees acquired before 1978, and pre-1978 documents that API retained, unless the [Insurers] could demonstrate—through a limited number of available, live witnesses—that, after the asset purchase, API employees (1) relied on such knowledge or documents while working for API or (2) expressly communicated such information or passed along such documents to others within API.
>
> This improper foundational requirement prejudiced multiple defenses. It conflicts with well-recognized corporate-knowledge principles . . . .
>
> . . . .
>
> This case should be remanded for a new trial to permit the [Insurers] to introduce admissible evidence on aspects of API's corporate knowledge that is critical to the [Insurers'] defenses. Exclusion of this knowledge impaired the [Insurers'] ability to prove late notice: the evidence would provide the jury with information essential to understanding the significance to API of the PCB contamination and cleanup in the late 1980s and 1990s . . . .
>
> Moreover, both the known-loss and expected-or-intended defenses were taken away from the jury on directed verdict, in substantial part based on the im-

161

> proper exclusion of this evidence going to the essential knowledge component of these defenses.

(Record citations omitted.)

¶ 64. As we begin to consider the Insurers' argument that it should have been allowed greater latitude to introduce additional information about API's knowledge of PCB contamination, we note that, contrary to the Insurers' brief, the "expected or intended" defense was dismissed on summary judgment prior to trial. Therefore, we reject without further discussion the Insurers' argument that the alleged erroneous exclusion of evidence affected the dismissal of their expected or intended defenses.

¶ 65. The Insurers argue that their known-loss and late-notice defenses were hampered by the trial court's limiting of certain testimony. They acknowledge that the trial court admitted evidence showing "that NCR employees knew of PCB contamination problems before 1978 and brought that knowledge to API," noting that API's general counsel testified "that as of 1978 API knew that the river sediments contained PCBs" and that a doctor who served in both "NCR's and API's Basic Research Department testified that he had extensive knowledge that PCBs were dangerous and, in 1976, he compiled a detailed report on PCB problems, including their impact on the environment." The Insurers argue that they should have also been able to introduce evidence that the report was distributed to numerous API employees and that by the mid- to late-1970s, "API employees knew PCBs were in the river."

¶ 66. The Insurers assert that the trial court kept certain evidence from the jury because it was " 'potentially prejudicial' to API while purportedly being only

162

'marginally relevant.' " We are unconvinced that the trial court erroneously exercised its discretion when it limited the amount of testimony concerning API employees' knowledge of PCBs. Specifically, the Insurers have not convinced us that denying the Insurers the opportunity to introduce additional evidence concerning API's knowledge of PCB contamination affected their substantial rights and, therefore, any alleged error is considered harmless. *See Martindale*, 246 Wis. 2d 67, ¶ 30.

¶ 67. The Insurers acknowledge that they were permitted to introduce testimony concerning API's knowledge of PCBs. They assert *additional* testimony would have aided their known-loss and late-notice defenses, but this is speculative. This was a twenty-two-day trial. The Insurers have not identified every instance where API's knowledge was discussed at trial. And yet, before we can decide whether a new trial is warranted based on the exclusion of that *additional* evidence, we must analyze what evidence was introduced, what evidence was not introduced and how the evidence affected the presentation of the Insurers' defenses. The Insurers have not provided enough information for us to determine that their substantial rights have been affected and, therefore, we reject their request for a new trial. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals need not address arguments that are inadequately developed).

### D. Allocation of responsibility among the various policies.

¶ 68. The Insurers argue that even if there is coverage under the policies, the trial court nonetheless erred when it allocated indemnity responsibility among the various policies. First, they argue the trial court should have applied horizontal exhaustion. Second, they

assert that the trial court should have "reduce[d] the available limits under each policy by amounts due under prior policies" based on a "non-cumulation provision" in numerous policies. (Capitalization omitted.) Finally, the Insurers argue that it was improper to establish damages in a post-trial show-cause hearing in a declaratory judgment action. We reject these arguments.

### 1. Vertical vs. horizontal exhaustion.

¶ 69. The trial court was faced with multiple years of policies, issued by a variety of companies, with multiple layers of different amounts of coverage in each year and each layer.[20] The jury found "there was 'property damage' under the policies occurring in the Lower Fox River and Green Bay" during each of the policy years. This finding meant that the Insurers' responsibility was continuously triggered in each year. *See Society Ins. v. Town of Franklin*, 2000 WI App 35, ¶¶ 8–9, 233 Wis. 2d 207, 607 N.W.2d 342 (continuous trigger theory adopted in the context of years of pollution seepage from a town dump that was later operated as a landfill).

¶ 70. Because many primary policies had already been paid, the trial court needed to determine in what sequence each excess Insurer could be required to pay indemnity under a policy it issued. The trial court, in a prescient ruling,[21] held that the policy language requires the Insurers to pay "all sums" that API is "obligated to pay" under CERCLA, subject to each

[20] For instance, the limit of the lowest level of coverage over the 1978–1985 period ranged from a low of $5 million dollars to a high of $100 million dollars. The second levels had a similar expansive range of coverage limits.

[21] The trial court's decision on January 21, 2009, was essentially repeated days later by our supreme court in *Plastics*

policy's "attachment point and limit of liability." The trial court rejected a pro rata approach to allocating the Insurers' responsibility across all the years of occurrence, which the Insurers described as "horizontal exhaustion." The horizontal exhaustion would have required allocating the Insurers' liability pro rata across all the policy years for each level of insurance provided as the costs were incurred under the Section 106 Order and each Insurer's attachment point was reached.

¶ 71. The trial court held that API could select a policy year during the coverage period, and work its way up the coverage "tower" for that year before moving to another year. Starting with the lowest level of insurance in the selected year, API could require indemnity by that policy until the limits were exhausted, then, as the attachment point for the next layer of insurance in that year was reached, move to the next policy until its liability limits were exhausted. This process would continue until all coverage for that year had been exhausted. The parties refer to this method as "vertical" exhaustion.

¶ 72. Days after the trial court ruling on the method of allocation, on January 29, 2009, our Supreme Court issued its opinion in *Plastics Engineering Co. v. Liberty Mutual Insurance Co.*, 2009 WI 13, 315 Wis. 2d 556, 759 N.W.2d 613. That case involved multiple claims against Plastics Engineering by numerous individuals based on long-term exposure to asbestos in Plastic Engineering's products. *Id.*, ¶ 6. Both primary and excess policies involved had been issued by Liberty Mutual, which argued that it had no duty to indemnify or to defend for any injury that occurred outside the

*Engineering Co. v. Liberty Mutual Insurance Co.*, 2009 WI 13, 315 Wis. 2d 556, 759 N.W.2d 613, released January 29, 2009. *See* discussion *infra*, ¶¶ 72–74.

policy period applicable to any specific policy. *See id.*, ¶¶ 7, 51.

¶ 73. Based on the policy language, the court held that each individual's injuries were caused by "continuous and repeated exposure to asbestos fibers," which constituted an "occurrence" under the language of Liberty Mutual's policy. *Id.*, ¶¶ 31, 35. The court noted that Wisconsin had previously adopted the "continuous trigger" theory[22] to determine which policies must indemnify when the injury does not occur entirely within one policy period. *Id.*, ¶¶ 51, 53.

¶ 74. The court explained that there are generally two approaches to allocating indemnification responsibility between insurance policies in multi-year injury cases. The pro rata method makes the policy responsible for damages "based upon the years that it provided coverage relative to years when no coverage was purchased" while the "all sums" approach requires the insurer "to pay all sums that result from bodily injury that has triggered a policy." *Id.*, ¶ 52. The court rejected Liberty Mutual's proposed pro rata allocation among policy years noting that the "policy contains no language that limits its obligation to a pro rata share" and held "that once this policy is triggered, Liberty Mutual must fully defend the lawsuit in its entirety and that under its policy, Liberty Mutual is responsible for 'all sums' up to policy limits, whether the compensation is for damage that occurs 'partly before and partly within the policy period.'" *Id.*, ¶¶ 51, 55. Emphasizing the rejection of a pro rata allocation in multiple year occurrence cases, the court also explained that "[i]n addition to our conclusion that a pro rata approach does

---

[22] *See Society Ins. v. Town of Franklin*, 2000 WI App 35, ¶¶ 8–9, 233 Wis. 2d 207, 607 N.W.2d 342, for a discussion of the "continuous trigger" theory.

not apply to allocating damages here, we also conclude that there can be no pro rata approach to the duty to defend." *Id.*, ¶ 60.

¶ 75. As we can see, Wisconsin has specifically refused to require proration among policies, which would require an insured to prove the value of damages in a specific year although the damages result from an occurrence that spanned multiple policy periods.

¶ 76. In support of their request for horizontal exhaustion, the Insurers relied on *GenCorp, Inc. v. AIU Insurance Co.*, 297 F. Supp. 2d 995 (N.D. Ohio 2003). We do not find that case useful. The relevant law in this state has been decided in *Plastics Engineering*, as we have discussed. Horizontal exhaustion, which is another name for pro rata allocation, has been rejected by our supreme court. We are bound by that decision. *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). In addition, there are sound reasons which support application of vertical exhaustion in this case.

¶ 77. Horizontal exhaustion, like pro rata allocation, is not required by any policy language suggested by the Insurers. We have independently reviewed the policies and find no requirement that policies issued in years before or after a particular policy be exhausted before the particular policy becomes responsible for an occurrence during its term of coverage. However, the policy language does require indemnification for "all sums" for which the insured is liable as a result of an occurrence during that policy year. The excess insurers wrote their policies based on other policies providing coverage beneath them *in that particular policy year;* the excess policy thus required exhaustion only of the policies below them *in that particular policy year* before the attachment point for which each had been compensated was reached. Horizontal exhaustion is thus not

consistent with policy provisions, but vertical exhaustion is consistent.

¶ 78. Horizontal exhaustion would create as many layers of additional litigation as there are layers of policies. For example, in 1978, 1979 and 1980, the first policy limit was $5 million. However, in 1981, the first-level policy limit was $51 million, while in 1982 the first-level policy was $100 million, but that policy contained a pollution exclusion. The limits for the first level in 1983 and 1984 were each $25 million, but again one policy contained a pollution exclusion. Finally, the first-level 1985 policy had a limit of $10 million. This created a total first-level limit of between $90 million and $215 million, depending on the validity of the pollution exclusions. The amount of first-level excess coverage that would have to be exhausted under horizontal exhaustion before the second level becomes available would require separate, complex litigation because of the variety of different first-level policy limits across the years.[23]

¶ 79. The Insurers object to vertical exhaustion because it allows API to select the sequence of the years from which to require indemnification. The contractual basis for that objection is difficult to discern, and none

--------

[23] The second levels of coverage provided a similarly wide range. For example, although the 1978, 1979 and 1980 second level of coverage each were triggered when the $5 million of coverage below was exhausted, under horizontal exhaustion, those policies could not be reached until additional millions of dollars had been paid by first-level policies issued from 1981 through 1985. The second-level policies in 1978 through 1980 would be excused from payment until payments higher than their attachment points had been satisfied by higher first-level policies purchased in 1981 through 1985. Policies in each successive higher level would reap unanticipated benefits if more than their attachment point had to be paid before their policies could be reached.

has been suggested. First, there is no contractual language which mandates exhaustion of other insurance policies *in years preceding or following* the year for which the specific carrier sold an excess policy. Next, the jury found an occurrence during each policy year. As an insurer is liable under the policy it sold if there is an occurrence during its policy period, presumably the Insurers here priced their policy, and collected the premium, based on the amount of insurance underneath them in coverage during the year for which they sold these policies. Because an insurer is liable for an occurrence during its coverage time, and only when its attachment point is reached, vertical exhaustion requires no insurer to pay more than it contracted to pay for any given policy year, after conditions to which it agreed have been met.

¶ 80. We conclude that the trial court's method of allocation is consistent with the contracts entered into by the parties, with the established law of this state, and with efficient administration of the courts.

### 2. Request for reduction of available limits by amounts due under prior policies, pursuant to non-cumulation provision.

¶ 81. In their opening brief, the Insurers argued that the trial court erred when it refused to enforce a Prior Insurance and Non-Cumulation of Liability provision ("non-cumulation provision") found in some of the Insurers' policies. In response, API argued that the only insurers who should be allowed to raise this issue on appeal are the two insurers who argued this issue at the trial court: Continental and Federal. In their reply brief, the Insurers asserted that "the carriers issuing these policies moved on this issue and the court ruled

169

generally that these provisions do not apply for *any* policies."

¶ 82. We have looked at every record citation relied on by the parties concerning this issue, as well as the CCAP[24] record in this case. We have located no evidence that any insurers other than Continental and Federal presented this issue to the trial court (Continental with a ten-page brief on the issue and Federal by filing a document joining in Continental's memorandum and discussing why the same arguments apply to Federal's policy). The lack of evidence that the other insurers—and in particular, Westport, the only insurer remaining in this case—sought to apply such clauses in their policies is particularly relevant because neither Continental nor Federal remain parties in this appeal. Because the applicability of this argument to the Westport policy was not raised at the trial court below, we decline to address it. *See State v. Schulpius*, 2006 WI 1, ¶ 26, 287 Wis. 2d 44, 707 N.W.2d 495 (we generally do not review an issue raised for the first time on appeal).

### 3. API's post-trial request for payment of remediation costs pursuant to WIS. STAT. § 806.04(8).

¶ 83. The Insurers argue that the trial court erred when it concluded that it had authority pursuant to WIS. STAT. § 806.04(8) to consider and grant API's petitions for remediation costs. The Insurers contend that such damages are not proper "supplemental relief," under that statute, which provides:

> SUPPLEMENTAL RELIEF. Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application therefor shall be

---

[24] Online records of Wisconsin circuit court proceedings are known as "CCAP" records.

> by petition to a court having jurisdiction to grant the relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree, to show cause why further relief should not be granted forthwith.

Instead, the Insurers argue, they "are entitled to full discovery and to have a jury determine the facts concerning the nature and extent of API's damages." We are not persuaded.

¶ 84. Our supreme court has considered whether a trial court may award damages at the conclusion of a declaratory judgment action. In *F. Rosenberg Elevator Co. Inc. v. Goll*, 18 Wis. 2d 355, 118 N.W.2d 858 (1963), the court considered a declaratory relief action filed pursuant to Wis. Stat. § 269.56 (1961–62), the predecessor to Wis. Stat. § 806.04. *Goll* recognized that "[i]t is not the role of declaratory judgment to take the place of an action for damages," *see id.* at 363, but then it added:

> But in a proper case for declaratory relief, where the court has entered a decree adjudicating the rights of parties and where the granting of relief in the form of damages may be predicated on that determination of rights, the court making the determination should also make that award of damages.

*Id.* The court subsequently reaffirmed this holding in *City of Milwaukee v. Firemen Relief Association of the City of Milwaukee*, 34 Wis. 2d 350, 149 N.W.2d 589 (1967). Citing *Goll*, *Firemen Relief* stated: "This court has recognized that a cause of action for declaratory relief may properly embrace in a single cause of action claims for further consequential relief which might otherwise be regarded as separate causes of action, including equitable relief and damages." *Firemen Relief*, 34 Wis. 2d at 358.

¶ 85. *Goll* and *Firemen Relief* are controlling and we are bound by those cases. *See Cook*, 208 Wis. 2d at 189. Here, the trial court has determined that the Insurers are liable for remediation costs that API is paying pursuant to the EPA's Section 106 Order. As API pays those costs, it may seek reimbursement from the Insurers, consistent with the judgment in this case. We conclude that "the granting of relief in the form of damages may be predicated on that determination of rights," *see Goll*, 18 Wis. 2d at 363, and, therefore, we affirm the trial court's decision to establish a procedure whereby API may submit petitions for costs and the Insurers may be heard at a show-cause hearing if they object to the petition.

¶ 86. At this time, the trial court has yet to consider the merits of API's petition for costs, and it is unknown whether any future petitions will be filed, given that every excess insurer except Westport has settled and those settlement monies may exceed the costs API eventually incurs responding to the Section 106 Order. We decline to offer specific guidance as to how the proposed show-cause hearings should be conducted, what issues may be considered or which costs may be reimbursed—those are issues for another day, if and when the trial court ever issues an order directing remaining insurer Westport to pay certain remediation costs.

## II. Westport's individual appeal.

¶ 87. Westport, which issued a single five-million-dollar excess policy for 1979 (the only policy still at issue in this appeal), has filed an individual appeal of an order denying its "motion for judgment notwithstand-

ing the verdict or, in the alternative, for a new trial on the issues of maintenance of underlying umbrellas and exhaustion of underlying policies."

¶ 88. In *Hicks v. Nunnery*, 2002 WI App 87, 253 Wis. 2d 721, 643 N.W.2d 809, we summarized the applicable standard of review of an order denying a motion for judgment notwithstanding the verdict:

> We review a trial court's denial of a motion for judgment notwithstanding the verdict de novo, applying the same standards as the trial court. A motion for judgment notwithstanding the verdict accepts the findings of the verdict as true but contends that the moving party should have judgment for reasons evident in the record other than those decided by the jury. The motion does not challenge the sufficiency of the evidence to support the verdict, but rather whether the facts found are sufficient to permit recovery as a matter of law.

*Id.*, ¶ 15 (citations omitted).

¶ 89. Westport argues that it was entitled to judgment notwithstanding the verdict because API failed to prove that: (1) "the underlying umbrella insurers have actually paid, or have been held liable to pay, their full policy limits"; and (2) API "complied with the maintenance of [the] underlying umbrella clause of the Westport policy." (Some capitalization omitted.)

¶ 90. The trial court denied Westport's motion at a motion hearing, for reasons stated on the record. The trial court concluded that the exhaustion issue was not a proper subject of a coverage trial and remained an open issue, implying that if and when API sought payment from Westport, it would then decide whether the policies below Westport had been exhausted. The trial court did not specifically address the maintenance-of-insurance issue, but denied the entire motion in a written order.

¶ 91. We read the trial court's order as one that determined Westport's objections to making payment were not ripe for resolution until API seeks payment from the Westport policy. *See State v. Armstead*, 220 Wis. 2d 626, 631, 583 N.W.2d 444 (Ct. App. 1998) (claims based on future or hypothetical facts are not ripe for judicial review). We affirm.

¶ 92. Westport's arguments are related to the maintenance and exhaustion of other policies that have been identified for the 1979 policy year. Those policies, beginning with the first level of coverage and listed in order of ascending coverage, are: (1) Liberty Mutual, five hundred thousand, primary insurance; Mission, $5 million, "umbrella liability";[25] (2) Hartford, $5 million, "excess liability policy"; (3) Westport, $5 million, "excess umbrella liability"; (4) London, $5 million, excess policy; and (5) Everest, $5 million, "excess umbrella liability."

¶ 93. Westport's policy contains two relevant provisions. First, a provision entitled "LIMIT OF LIABILITY—UNDERLYING LIMITS" states that Westport is liable "only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability." The "Underlying Umbrella Insurers" are identified as those listed "in the Underlying Umbrella Policies stated in Item 2 of the Declarations and issued by various [insurers] as per schedule on file with the company." Item 2 of the policy does not identify individual "Underlying Umbrella Policies," stating instead: "various as per schedule on file with the

---

[25] The quoted terms in this paragraph refer to the title listed on each insurance policy's declarations page; whether the policies are indeed "umbrella" or "excess" policies is not an issue we decide on appeal.

company." (Capitalization omitted.) The schedule is not attached to the policy and does not appear to have been provided in this litigation.[26]

¶ 94. The second Westport insurance policy provision at issue, related to maintenance of other policies, states:

MAINTENANCE OF UNDERLYING UMBRELLA

It is a condition of this policy that Underlying Umbrella Policies shall be maintained in full effect during the currency hereof except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this policy.

¶ 95. Westport argues that API failed to both maintain and exhaust underlying insurance policies as required by the Westport policy.[27] Specifically, it contends that the underlying policies were not exhausted because one underlying policy, the Mission policy, never covered API, and because Hartford was dismissed from this action "presumably" after settling with API "for less than its policy limits." Westport contends the underlying policies were not maintained because API did not qualify as an insured under the Mission policy.[28]

---

[26] In its response brief, API asserts that Westport has not produced the schedule and Westport does not deny this assertion in its reply brief.

[27] Westport does not argue that the alleged failure to exhaust the other policies was caused by one insurer's insolvency, and we do not address that issue.

[28] Westport also mentions again that Hartford settled its case with API, but Westport does not explain how that settlement would constitute a failure to maintain coverage and we infer that Westport was simply mentioning Hartford in passing.

¶ 96. Westport urges us to reverse the trial court's order denying Westport's motion for judgment notwithstanding the verdict. We decline to do so. Numerous issues have not been adequately developed or decided by the trial court. For instance, Westport's arguments rely in part on its assertion that there was no coverage for API under the Mission policy. Mission is not a party in this case. Whether the Mission policy covered API was an issue raised in a motion for summary judgment filed by Everest in which Westport did not join. After extensive oral argument in March 2007, Everest was granted summary judgment holding that it was not liable to API for the 1979 policy year, for reasons that may or may not have been related to language in Mission's policy, which Everest's policy referenced.[29] After the 2008 trial, Westport for the first time attempted to assert that it could rely on the trial court's rulings with respect to Mission's policy to argue that the Mission policy provided no coverage and, therefore, API failed to exhaust or maintain underlying coverage. Whether the basis for the trial court's summary judgment in Everest's favor supports Westport's argument is not an issue that is sufficiently developed for us to decide it.

¶ 97. Another issue not yet addressed by the parties (but mentioned by API in its trial court and appellate briefs), is whether Hartford is an "underlying umbrella insurer," even though its policy is not designated as an umbrella policy. Thus, its settlement may

---

[29] The basis for Everest's motion and the trial court's reasoning were not discussed by Westport on appeal. Our independent review of the pleadings and the transcript leads us to conclude that the basis for the trial court's ruling is not entirely clear.

This summary judgment ruling was not appealed, according to API, because it settled with Everest "before the deadline for API to file any cross-appeal."

not even be relevant to Westport's exhaustion and maintenance arguments if Hartford is not considered an underlying umbrella insurer.

¶ 98. These are but a few of the undeveloped issues that will need to be addressed if and when API seeks payment from Westport.[30] At the time these issues are considered by the trial court, payments API has received under other policies may well affect the outcome. Therefore, the trial court correctly determined that the issues were not ripe for determination until API seeks payment from Westport. We affirm the trial court order denying Westport's motion for judgment notwithstanding the verdict.[31]

## CONCLUSION

¶ 99. We affirm the trial court as to each issue raised by the Insurers jointly and Westport individually. The stay of the trial court proceedings concerning API's petition for payments pursuant to the insurance policies is lifted upon remittitur.

*By the Court.*—Judgment affirmed.

---

[30] API does not appear to contest this proposition. For instance, in its response brief, API recognized with respect to the exhaustion issue that whether " 'the Underlying Umbrella Insurers have paid or *have been held liable to pay* the full amount of their respective ultimate net loss liability' " was an issue the trial court would decide "when the issue of Westport's payment arises." (Quoting the Westport policy.)

[31] Westport argues that if we decline to enter judgment in its favor, we should reverse and remand to the trial court "with instructions that API must prove that the underlying umbrella insurers have actually paid, or been held liable to pay, their policy limits in order to trigger the Westport policy." We decline to issue such instructions. If and when API seeks to recover from the Westport policy—which may or may not come to pass given API's settlement with all other insurers—the trial court can develop and decide these issues.

¶ 100. FINE, J. (*dissenting*). A fundamental tenet of American law is that folks have a right to be heard " 'at a meaningful time and in a meaningful manner' " before they may be deprived of a property interest. *Mathews v. Eldridge*, 424 U.S. 319, 333–335 (1976) (quoted source omitted); *see also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The insurance companies in this appeal (all of whom but one have, sadly in my view, settled) did not have that chance—either in 1998 when Appleton Papers assumed liability for NCR's pollution, or in the circuit court here.[1] Accordingly, I respectfully dissent.

---

[1] I say "sadly" because whether an insurance company is responsible to an insured who voluntarily assumes liability without giving the insurance company a chance to object is a critical issue that should not be at least partially swept under the rug by the expediency of settlement. In short, permitting an insured to bind its insurer by blindsiding that carrier threatens the continued viability of the very concept of contracted-for insurance and, as a consequence, the whole insurance industry, upon which so much economic and social stability depends.

A simple hypothetical, albeit not wholly concurrent with the facts of this case, makes it clear. Assume that Sam Smith is driving a truck down a desert highway. He sees an accident ahead. He slows and stops. The drivers involved in the accident assume that he may have proverbial "deep pockets." They sue him in the local court. Believing that his personal auto-insurance policy does not cover his business use of the truck, he does not tell the carrier. He hires a lawyer and defends. The plaintiffs approach him with an offer: assume part of the liability. Although still believing that he should not pay anything because he had nothing to do with the accident, he settles (perhaps to avoid further litigation expenses)—much like Appleton Papers did here. He then "notifies" his insurance company. Under the Majority's decision in this case, the carrier could not contest Smith's assumption of liability.

¶ 101. The main issue on this appeal is, as I see it, fairly simple. By order dated November 13, 2007, and designated as "Administrative Order for Remedial Action," the Environmental Protection Agency directed NCR Corporation and Appleton Papers, Inc., to remediate parts of the Fox River contaminated with polychlorinated biphenyls. (Uppercasing and bolding omitted.) The order was issued under the authority and pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et. seq. See* 42 U.S.C. § 9606 (codifying § 106 of the Act). None of the parties dispute that NCR is liable, at least in part, for the ordered remediation. Also, insofar as Appleton Papers is concerned, none of the parties dispute that it is also responsible in part for the remediation. The issue boiled to its essence is whether Appleton Papers's insurance carriers may be forced to pay for Appleton Papers's liability under the 106 Order.

¶ 102. The 106 Order, tacitly acknowledging that Appleton Papers did not pollute the Fox River, pinned Appleton Papers's liability on its status as a "successor" to NCR. Thus, in paragraph 7.a.ii, the 106 Order recites, as material: "Appleton Papers, Inc., is a party that is liable for payment of response costs and performance of response activities at the [Fox River] Site *because* [Appleton Papers] is: (1) a successor to one or more corporate predecessors that, at the time of disposal of hazardous substances" released "hazardous substances to the [Fox River] Site." (Acronyms omitted, emphasis added.)[2] The 106 Order's reference to Appleton Papers's status as a

---

[2] Subsection "(2)" reads: "a successor to one or more corporate predecessors that by contract, agreement, or otherwise arranged for [the] disposal or treatment of hazardous substances at a facility owned or operated by another party or

"successor" was based on the Order's further recitation, in paragraph 7.a.vi, that in 1978, Appleton Papers "acquired the assets of the Appleton Papers Division from NCR, and Appleton Papers . . . assumed certain liabilities in connection with the asset purchase."

¶ 103. The November 2007 Order was not, of course, the first indication that NCR and Appleton Papers might be responsible for the Fox River cleanup. Indeed, in 1995, NCR sued Appleton Papers in federal court seeking Appleton Papers's indemnification for "any and all of [NCR's] liabilities related to environmental contamination of the Fox River in Wisconsin." Although Appleton Papers would seek insurance coverage (which is what this case is all about) for whatever indemnification it owed NCR, it never told the carriers about the lawsuit. It did not, however, admit liability at that point, but, rather, counterclaimed against NCR seeking to have NCR indemnify it for the Fox River contamination. Three years later, without alerting the insurance companies, Appleton Papers settled the federal lawsuit with NCR, and assumed a large percentage of the liability for the Fox River cleanup. Six months later, Appleton Papers gave "notice" to the carriers.

¶ 104. Cutting this complex case to its bone, it has to be conceded by all that *if* the 1995 federal-court lawsuit had not been settled, but, rather, *if* the federal courts had ruled that Appleton Papers had *no* indemnification responsibilities, the carriers here, too, would be free of any liability for the Fox River remediation.

¶ 105. It is true, as the Majority recognizes, that pollution-responsibility *vel non* under the Act must be determined in federal court, and, as noted, NCR and Appleton Papers were on their way to having that issue

entity and from which there has been a release of hazardous substances to the [Fox River] Site."

decided in the appropriate forum.[3] That journey, however, as we have seen, was ended when NCR and Appleton Papers settled—without notice to the carriers. Under the recognized right-to-be-heard principles already mentioned, the insurance companies had a right to intervene and be heard in the 1995 federal-court action if the result of that case would bind them. Given the back-alley settlement, they have a right to have *their* liability determined here. That is, if Appleton Papers improvidently settled with NCR and, under the law, would not have been liable to NCR for part of the remediation costs, the carriers are not liable to Appleton Papers under the insurance policies. Let me be clear: I am *not* saying that a state court can determine liability under the Act between potentially responsible parties—that, as already noted, must be litigated in federal court. A state court *can,* however, determine whether the insured did anything that either prejudices the carriers or in any other way forfeits the insured's right to collect on the insurance. The circuit court deprived the carriers of the chance to make that showing. The Majority says that this is OK. I respectfully dissent, and would remand for a trial on whether, under the rationale explained in this dissent, the carriers (or,

---

[3] The law in the Seventh Circuit is that an asset-purchaser is not responsible for a predecessor's remediation liability unless there are one of four reasons to affix that responsibility: "(1) the purchaser expressly or impliedly agrees to assume the liabilities; (2) the transaction is a de facto merger or consolidation; (3) the purchaser is a 'mere continuation' of the seller; or (4) the transaction is an effort to fraudulently escape liability." *North Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 651 (7th Cir. 1998), *overruled on another ground by Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 986 (7th Cir. 2010). Apparently, the only element that applies here is the first—an express or implied assumption of liability.

in light of the settlement, Westport Insurance Corporation) are liable under their Appleton Papers policies.[4]

[4] The Majority cites *Leverence v. United States Fidelity & Guaranty*, 158 Wis. 2d 64, 462 N.W.2d 218 (Ct. App. 1990), *overruled on other grounds by Wenke v. Gehl Co.*, 2004 WI 103, ¶¶ 21, 29, 274 Wis. 2d 220, 235–236, 682 N.W.2d 405, 412–413, for the proposition that no notice was required until *Johnson Controls, Inc. v. Employers Ins. of Wausau*, 2003 WI 108, 264 Wis. 2d 60, 665 N.W.2d 257, was decided. In *Leverence*, however, it was a jury question whether the property damage in that case put the insured on sufficient notice that there might be covered losses. *Id.*, 158 Wis. 2d at 75–76, 462 N.W.2d 218, 223 (the test is whether the insured had "reasonable grounds" to suspect that there might be coverage). The same test applies here. Further, and significantly, although *Johnson Controls* was not decided until 2003, Appleton Papers told its carriers in August of 1998, which, of course, was some six months after the settlement, that it expected the carriers to pay for that liability. Given the Majority's reliance on *Leverence* and *Johnson Controls*, it is helpful to look at this "notice" in some detail. The key part of the August "notice" recited:

> The Fox River environmental matters involve the presence of PCBs in the land and water in the Fox River watershed in and around Green Bay, Wisconsin. Potential claimants include the Wisconsin Department of Natural Resources, the U.S. Environmental Protection Agency, the U.S. Department of the Interior, and private landowners. Potential claims could involve both remediation and natural resource injury components. Appleton's involvement arises out of allegations that facilities currently owned by Appleton were one possible source for the introduction of PCBs into the Fox River watershed. The use of PCBs in manufacturing at these facilities ceased in 1971. However, the involved governmental regulatory agencies are investigating whether the harm, if any, caused by the presence of PCBs in the watershed continues to the present day.

This is clarion evidence that Appleton Papers did not need *Johnson Controls* to tell it that it was, potentially at least, on the hook for the contamination of the Fox River.