STATE of Wisconsin, Plaintiff-Respondent,

v.

Gene A. ECHOLS, Defendant-Appellant.

Court of Appeals

*No. 2012AP422–CR. Submitted on briefs December 5, 2012.
—Decided April 9, 2013.*

2013 WI App 58

(Also reported in 831 N.W.2d 768.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Gary E. Grass* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. VanHollen*, attorney general, and *Thomas J. Balistrieri*, assistant attorney general.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J. Gene A. Echols appeals the judgment convicting him of second-degree sexual assault and sexual assault of a child by a person who works with children, contrary to Wis. Stat. §§ 948.02(2)

and 948.095(3)(a) (2011–12),[1] as well as the order denying his postconviction motion. Echols makes numerous arguments on appeal, two of which we address in this opinion. Echols, who was convicted of assaulting a high school student while working as a school bus driver, argues that the trial court erred in prohibiting evidence of the student's school disciplinary records, including the fact that the student's long history of disciplinary problems had resulted in her being placed on a "behavioral contract" acknowledging that she would face expulsion for any subsequent altercations. According to Echols, this evidence should have been admitted to show that the student, who had misbehaved on the school bus shortly before the alleged assault and who was consequently in danger of breaking her "behavioral contract," had a motive to fabricate the assault. Echols also argues that the trial court erred in admitting testimony from the bus company's safety director that Echols only stutters when he is lying. We agree with Echols that the trial court erroneously exercised its discretion in both respects and that, because the errors were not harmless, the errors warrant reversal. We therefore reverse the conviction and order, and remand for a new trial.

## BACKGROUND

### A. Nature of the Case

¶ 2. Twenty-three-year-old Echols was charged with second-degree sexual assault, attempted second-degree sexual assault, and sexual assault of a child by a person who works with children. In the complaint, the victim, a fifteen-year-old student of Whitefish Bay High

[1] All references are to the 2011–12 Wisconsin statutes unless otherwise noted.

School, alleged that Echols, who worked as a school bus driver, assaulted her on the bus on the way to school one morning. According to the complaint, the student was the first passenger on the school bus on the morning in question; after she was picked up, Echols made two unscheduled stops during which he assaulted her. The complaint further stated that Echols threatened to assault the student again if she reported the incident.

¶ 3. Echols pled not guilty to all charges and testified in his own defense at trial. Echols' version of the events was that the student fabricated the assault in order to preempt a potential report for her own misconduct while riding the bus. Echols testified that —contrary to the student's assertion—he did not make any unscheduled stops on the morning in question; rather, the first pickup did not show, and the second allegedly unscheduled stop was made because the student in question was threatening to throw a snowball at him. According to Echols, the student had, a couple of weeks earlier, thrown a snowball at him while he was driving, which hit him in the face and knocked off his glasses. On the morning in question, she was threatening to do it again. Echols testified that from the rearview mirror it appeared that the student, who was sitting behind him, had something in her hand, so he pulled over. He then went to where the student was sitting and said something to the effect of "stop playing like that" and "I get you for that snowball you hit me with" in order to see whether she did in fact have a snowball in her hand and to get her to stop making mischief. Echols claims that while doing this, he slipped and fell, and that any resulting contact with the student was accidental and not sexual.

## B. *Evidence of the victim's school disciplinary records.*

¶ 4. Echols sought to introduce the student's school disciplinary records in order to show her motive for lying about what happened on the bus the morning of the alleged assault. Specifically, Echols sought to admit documents showing that the student had a long record of disciplinary problems at school, including fights, threats—specifically, threatening to knife a classmate while on the bus—and plagiarism. Echols also sought to submit evidence that the student's long history of disciplinary problems had resulted in her being placed on a "behavioral contract" acknowledging that she would face expulsion for any subsequent altercations. Echols' theory was that if the school received word that the student had thrown a snowball at him previously or that she was threatening to do it again, she might be expelled from school; therefore, in order to garner sympathy and avoid punishment for causing mischief on the bus, the student claimed that Echols had assaulted her. Echols' attorney additionally explained at a motion hearing that many of the student's disciplinary actions were handled by her school's associate principal, and it was, suspiciously enough in Echols' estimation, the associate principal to whom the student reported the assault.

¶ 5. The State sought to exclude the evidence of the student's disciplinary records, arguing that they would unduly prejudice the student, re-victimize her, and offend public policy by deterring victims from coming forward unless they had the virtue of "Mother Theresa." The State also argued that the disciplinary records were inadmissible because the defense unlawfully obtained them.

¶ 6. The trial court refused to admit the evidence of the student's disciplinary records, determining that they were: (1) inadmissible "other acts" evidence because there was no link between the student's alleged behavioral issues and a motive to fabricate the assault; (2) unfairly prejudicial because a victim such as the student should not be "subject to having [her] entire life's history dredged up against [her]"; and (3) unlawfully obtained.

C. *Evidence of Echols' character and stuttering.*

¶ 7. At trial, Echols presented evidence relating to his character and credibility, including testimony from his mother, friend, and girlfriend. Echols' trial testimony also included the fact that he suffers from a pathology of speech that causes him to stutter—in other words, to speak haltingly or repetitively, or to compensate by inserting words or short phrases such as "um," "like," and "you know," or to make repetitive motions with his hands or feet to get his words out. Echols presented testimony that he has stuttered since childhood, that some of his relatives stuttered, and that his stuttering has exposed him to prejudice and led to special class placements.

¶ 8. Evidence of Echols' character and stuttering was also elicited by the State; specifically, from the director of safety for the school bus company where Echols worked. The safety director testified that Echols was by all accounts a good employee. She testified that all of the company's evaluations found that Echols was doing well; there were no other complaints about him from students; Echols believed that driving a school bus was a responsible job; Echols had a good driving record; and that Echols was a decent young man.

¶ 9. The safety director further testified that the only blemish on Echols' personnel record was that he had been late to work, and that sometimes he changed his story about why he was late. The prosecutor asked the safety director if there were times when Echols had been dishonest with her. She replied that there were, and that Echols' demeanor was the same every time he lied. The safety director testified that when Echols was lying to her his eyes would drop, his head would go down, and he would stutter. The safety director also testified that Echols did not stutter in normal conversation when he was not lying.

¶ 10. Her testimony included the following exchange:

Q: There have been times where in your opinion Mr. Echols was dishonest with you, is that right?

A: Yes.

Q: What sorts of things are we talking about?

A: If when you ask him, you know, why he was late in the morning, you know he – sometimes he'd say one thing and then you'd ask him again and the story would change a little bit. You know, a lot of times the drivers when they oversleep they don't like to tell you that I was up late last night and I overslept. You know, so they'll say that they were sick and you'll say what did you have, you know, and then, you know, kind of –

Q: So, there have been times when Mr. Echols was dishonest with you, is that right?

A: Yes.

Q: And do you notice anything in particular about [Echols'] speech when you feel he's being dishonest with you?

(Objection, argument, and ruling omitted.)

A: When [Echols] – when he's speaking to you, he'll speak to you just, you know, talk to you, but I've tended to notice that when he's lying, his eyes will drop, his head will go down and he will stutter. And that happens every time.

Q: Does he appear to stutter when he's not lying about something? ·

A: No. No. If you're having a conversation with him, you never know he stutters. Unless he's nervous.

¶ 11. Echols objected to this testimony and requested a mistrial, which was denied. The trial court had initially excluded this evidence, but later decided to allow it on the basis that Echols had "opened the door" by eliciting evidence of his stuttering and good character. The trial court further opined that Echols did not noticeably stutter while testifying, but the defense thought that Echols stuttered continuously.

¶ 12. The jury found Echols guilty of second-degree sexual assault and sexual assault of a child by someone who works with children, and he was sentenced. Echols filed a postconviction motion raising numerous issues, including the admissibility of the student's disciplinary history and testimony that Echols only stutters when he is lying. The motion was denied, and Echols now appeals.

#### ANALYSIS

*Standard of Review*

¶ 13. On appeal, Echols argues that we ought to reverse his conviction. Echols makes numerous arguments, two of which we address here. Echols argues that the trial court erred in prohibiting evidence of the student's disciplinary record. He also argues that the

trial court erred in admitting testimony from the safety director that Echols only stutters when he is lying.[2]

¶ 14. "We apply the erroneous exercise of discretion standard to both evidentiary issues in this case." *See State v. Shomberg*, 2006 WI 9, ¶ 10, 288 Wis. 2d 1, 709 N.W.2d 370. Our inquiry is " 'highly deferential.' " *See id.*, ¶ 11 (citation omitted). " 'The question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record.' " *See id.* (citation omitted). We uphold evidentiary rulings if we conclude that the trial court " 'examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach.' " *Westport Ins. Corp. v. Appleton Papers Inc.*, 2010 WI App 86, ¶ 48, 327 Wis. 2d 120, 787 N.W.2d 894 (citation omitted).

¶ 15. If we do determine that the trial court erroneously exercised its discretion in admitting or excluding evidence, we must then "conduct a harmless

---

[2] The headings and standard of review analysis in Echols' brief frame the issues on appeal as "prosecutorial misconduct." However, Echols' substantive discussion of the issues—as well as the State's response—focuses on whether the evidence of the student's disciplinary records and Echols' stuttering was properly admitted or prohibited. We therefore analyze the issues using the standard of review related to the trial court's discretion in admitting or prohibiting the admission of the aforementioned evidence, and determine whether the alleged errors warrant a new trial. *See State v. Olson*, 127 Wis. 2d 412, 419, 380 N.W.2d 375 (Ct. App. 1985) (court of appeals not bound by parties' framing of legal issues).

error analysis to determine whether the error 'affected [Echols'] substantial rights.' " *See Martindale v. Ripp*, 2001 WI 113, ¶ 30, 246 Wis. 2d 67, 629 N.W.2d 698 (citation omitted). In other words, we must determine whether " 'there is a reasonable possibility that the error contributed to the outcome of the case.' " *See Westport Ins. Corp.*, 327 Wis. 2d 120, ¶ 49 (citations omitted). An error is *not* harmless if it undermines our confidence in the outcome of the proceeding. *See id.*; *see also Martindale*, 246 Wis. 2d 67, ¶ 32. Whether an error was harmless presents a question of law that this court reviews *de novo. State v. Ziebart*, 2003 WI App 258, ¶ 26, 268 Wis. 2d 468, 673 N.W.2d 369.

A. *Evidence of the student's disciplinary record should have been admitted.*

¶ 16. As noted, the trial court refused to admit the evidence of the student's disciplinary records, determining that they were: (1) inadmissible "other acts" evidence because there was no link between the student's alleged behavioral issues and a motive to fabricate the assault; (2) unfairly prejudicial because a victim such as the student should not be "subject to having [her] entire life's history dredged up against [her]"; and (3) unlawfully obtained. We conclude, however, that at a minimum, the student's school disciplinary records—specifically, the "behavioral contract"—should have been admitted.

■

¶ 17. In *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998), the supreme court outlined the analytical framework used to determine the admissibility of other acts evidence under Wis. Stat. §§ 904.04(2) and 904.03:

(1) Is the other acts evidence offered for an acceptable purpose under Wis. Stat. § (Rule) 904.04(2), such as establishing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident?

(2) Is the other acts evidence relevant, considering the two facets of relevance set forth in Wis. Stat. § (Rule) 904.01? The first consideration in assessing relevance is whether the other acts evidence relates to a fact or proposition that is of consequence to the determination of the action. The second consideration in assessing relevance is whether the evidence has probative value, that is, whether the other acts evidence has a tendency to make the consequential fact or proposition more probable or less probable than it would be without the evidence.

(3) Is the probative value of the other acts evidence substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence? *See* Wis. Stat. § (Rule) 904.03.

If the other acts evidence was erroneously admitted in this case, the second issue presented is whether the error is harmless or prejudicial.

*See Sullivan*, 216 Wis. 2d at 771–73 (footnote omitted).
■

¶ 18. Applying the *Sullivan* framework here, we conclude, first, that the evidence was offered for an acceptable purpose: showing that the student had a motive to fabricate the assault. *See id.* at 772. If, as Echols portends, the school documents do show that the student had signed a "behavioral contract" just before the assault occurred, and if that contract threatened expulsion should the student become involved in an-

other school-related altercation, the documents would show that the student had a motive to lie about the assault. According to Echols, the student had thrown a snowball at him while he was driving the bus about two weeks before the alleged assault, and, on the morning of the alleged assault, she was threatening to do it again.

¶ 19. Second, contrary to what the trial court found and what the State argues on appeal, this evidence *is* relevant. *See id.* The evidence is relevant to show the student knew she would very likely be expelled for throwing and/or threatening to throw a snowball, and that she was trying to point a finger at Echols' alleged wrongdoing in order to divert attention from her own.

¶ 20. Third, the probative value of the evidence far outweighed any prejudice posed to the student. *See id.* at 772–73. In determining that the evidence was unfairly prejudicial, the trial court analogized the student's disciplinary history to a victim's sexual history, which is generally inadmissible under our state's rape shield statute. *See* Wis. Stat. § 972.11(2)(b) (generally prohibiting "any evidence concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct" in a sexual assault case); *see also State v. Pulizzano*, 155 Wis. 2d 633, 647, 456 N.W.2d 325 (1990) (explaining "legitimate state interests" underlying rape shield law). But the evidence at issue is distinct from the student's sexual history, and the State sets forth no authority for treating it as such. Rather, the evidence at issue refers to the student's credibility, and, as explained above, whether she had a motive to fabricate the assault.

¶ 21. Moreover, the decision to prohibit the evidence was not harmless. *See Sullivan*, 216 Wis. 2d at 771–73. Because the evidence was improperly excluded, the jury was not given the opportunity to hear important testimony that bore on an important issue of the case—namely, whether the student did in fact have a motive for fabricating the assault. The prohibition of evidence that was central to Echols' theory of the case undermines our confidence in the trial's outcome. *See Westport Ins. Corp.*, 327 Wis. 2d 120, ¶ 49; *Martindale*, 246 Wis. 2d 67, ¶ 32.

¶ 22. We also conclude that the trial court erred in refusing to admit the evidence on the basis that it was allegedly unlawfully obtained. The parties agree that the documents were not obtained in compliance with Wis. Stat. § 118.125, the pupil records statute. Section 118.125(2)(f) provides:

> Pupil records shall be provided to a court in response to subpoena by parties to an action for *in camera* inspection, to be used only for purposes of impeachment of any witness who has testified in the action. The court may turn said records or parts thereof over to parties in the action or their attorneys if said records would be relevant and material to a witness's credibility or competency.

(Emphasis added.) Rather than subpoena the records and have them sent to the trial court for an *in camera* inspection, it appears from our review of the record that Echols' attorney obtained them directly from the school via facsimile, and then later sought the court's permission to admit them at trial. As noted, the trial court determined that this was improper. On appeal, the

State argues that the trial court was correct to prohibit the defense from using the records because they were not obtained in compliance with the statute. The State provides no authority for construing the statute this way, however, and we think its proposed remedy for noncompliance with the statute is too harsh, particularly in this circumstance where there is no evidence that defense counsel sought to disregard the confidential nature of the records. Rather, it appears that neither defense counsel nor the high school was familiar with the requirements of § 118.125(2)(f) and that neither wholly complied with the statute during discovery when the school faxed the records directly to defense counsel upon defense counsel's request. In any event, suppression of the evidence was not the appropriate remedy. The trial court could have, and should have, upon receipt of the documents, conducted the *in camera* inspection required by the statute, while requiring the parties to keep the documents confidential. Then, pursuant to the statute, the trial court should have determined which, if any, portions of the records were admissible for purposes of impeachment of the student. *See id.*; *see also S.P.A. ex rel. Ball v. Grinnell Mut. Reinsurance Co.*, 2011 WI App 31, ¶ 12, 332 Wis. 2d 134, 796 N.W.2d 874 (trial court is "gatekeeper" of pupil records whose "role is to protect the privacy of the pupil whose records are sought, releasing only those records which may concern a specific witness's credibility or competency"). Given that the records were already in defense counsel's and presumably the State's possession, the statutory admonition that the trial court turn the relevant portions of the records over to parties would be unnecessary.

97

¶ 23. Therefore, because the evidence was improperly excluded, and because the error was not harmless, we conclude that the trial court's erroneous exercise of discretion constitutes reversible error in this case. *See Martindale*, 246 Wis. 2d 67, ¶ 30.

B. *Evidence that Echols only stutters when he is lying should have been excluded.*

¶ 24. We also agree with Echols that the admission of testimony from the safety director that Echols only stutters when he is lying constitutes reversible error. While Echols undoubtedly put his character and credibility at issue and thus invited rebuttal testimony from the State, *see* WIS. STAT. § 904.04(1)(a) ("Evidence of a pertinent trait of the accused's character offered by an accused, or by the prosecution to rebut the same" is admissible.), the testimony allowed by the trial court went too far. Contrary to what the State argues, the safety director did much more than simply testify that in some respects Echols was not a model employee. The testimony also went far beyond describing the safety director's perception of Echols at a particular moment. In this case, the safety director extrapolated from a couple of instances—instances that, due to their vague and generalized nature, we cannot be sure actually apply to Echols[3]—to opine that Echols *always* stutters when he lies. In other words, the safety director presented herself as a human lie detector. *See United*

---

[3] We again refer to the following exchange between the prosecutor and the safety director:

Q: There have been times where in your opinion Mr. Echols was dishonest with you, is that right?

A: Yes.

Q: What sorts of things are we talking about?

*States v. Williams*, 133 F.3d 1048, 1052–53 (7th Cir. 1998) (police officer's "human lie detector" testimony that defendant avoided eye contact and lowered head while being questioned about a bank robbery was inadmissible opinion testimony); *see also People v. Henderson*, 915 N.E.2d 473, 477–78 (Ill. App. 2009) (detective's testimony regarding defendant's body language during interview as indicating deception was inadmissible, but harmless error).

¶ 25. The safety director's testimony that Echols always stutters when he lies was inadmissible lay opinion testimony. First, it was not "helpful to a clear understanding" of her testimony. *See* WIS. STAT. § 907.01(2) (capitalization omitted). The safety director testified that sometimes Echols was late for work, and that he sometimes lied about why he was late. The safety director further explained that when Echols lied, he would change his story "a little bit" about why he was late. This was all that was needed to rebut Echols' character and credibility testimony. Although the State argues that the testimony at issue was necessary to show that Echols actually *did* lie on the alleged occasions and that it was not unfairly prejudicial, *see* WIS. STAT. § 904.03, we disagree and conclude that it was

---

A: If when you ask him, you know, why he was late in the morning, you know he – sometimes he'd say one thing and then you'd ask him again and the story would change a little bit. *You know, a lot of times the drivers when they oversleep they don't like to tell you that I was up late last night and I overslept. You know, so they'll say that they were sick and you'll say what did you have, you know, and then, you know . . . .*

(Emphasis added.) We note that testimony here refers to instances when bus drivers as a group—not Echols specifically —lie about why they are late to work.

(a) unnecessary to make this point, and (b) that the unfair prejudice greatly outweighed any probative value, *see id.* Nor was the testimony helpful to "the determination of a fact in issue" because whether Echols stuttered when he lied to his employer had nothing to do with whether he assaulted the student. *See* § 907.01(2). The trial court erred in allowing the testimony.

¶ 26. We find support for our conclusion in *State v. Haseltine*, 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984). In *Haseltine*, the defendant was accused of sexually assaulting his teenage daughter. *Id.* at 93, 95. The evidence submitted by the State included testimony by a psychiatrist "concerning the pattern of behavior exhibited by incest victims," which included the psychiatrist's opinion that "there 'was no doubt whatsoever' " that the defendant's daughter was an incest victim. *Id.* at 95–96. This court reversed the conviction, finding that the testimony was inadmissible and that the error was not harmless. *Id.* at 96–97. While *Haseltine* dealt with an improper expert opinion, *see* WIS. STAT. § 907.02, our reasoning in that case clearly applies to the safety director's lay opinion in this case:

> "[T]he jury is the lie detector in the courtroom." The opinion that Haseltine's daughter was an incest victim is an opinion that she was telling the truth . . . . *No witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth.*
>
> We cannot conclude that the error in admitting the opinion testimony was harmless. Haseltine's conviction depended on the jury believing the daughter's testimony. While there was some medical evidence corroborating her testimony that Haseltine had threatened and beat her, her account of the sexual assault was not corroborated by independent evidence. Haseltine's entire defense consisted of witnesses who testified that

the daughter was dishonest. Under these circumstances, the psychiatrist's opinion, with its aura of scientific reliability, creates too great a possibility that the jury abdicated its fact-finding role to the psychiatrist and did not independently decide Haseltine's guilt.

*See Haseltine*, 120 Wis. 2d at 96 (citations omitted; emphasis added; brackets in *Haseltine*). Analogous to *Haseltine*, in which the testimony at issue was an implicit opinion that the victim was telling the truth, the safety director's testimony in the case before us is an improper opinion that Echols always stutters when he lies. In other words, she cannot vouch for when Echols is not telling the truth. *See id.*

■■■

¶ 27. Moreover, we conclude that the error was not harmless, particularly in this case because Echols did in fact stutter. Even taking into account the trial court's determination that Echols did not "stutter" while testifying at trial, but that he merely "stammered" —which appears to be a distinction without a difference[4]—there can be no doubt that the safety director's testimony placed undue significance to each "like," "um" or "ah" that Echols uttered while testifying. Additionally, while, as in *Haseltine*, there was some physical evidence supporting the student's version of events in the form of Echols' DNA on her neck, this case depended heavily on whether the jury found the student or Echols more credible. *See id.*, 120 Wis. 2d at 96. There were no other witnesses to the incident.

---

[4] WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2271 (3D ED. 1993) defines "stutter" as "to speak with involuntary disruption or blocking of speech. It defines "stammer" as "to make involuntary stops and repetitions in uttering syllables and words." *See id.* at 2222.

¶ 28. Therefore, because the trial court erred in admitting testimony that Echols only stutters when he lies, and because the error was not harmless, we conclude that the trial court's erroneous exercise of discretion constitutes reversible error.

## CONCLUSION

¶ 29. In sum, because the trial court erroneously exercised its discretion with respect to the admissibility of records and testimony as explained above, and because the errors were not harmless, we reverse the conviction and grant Echols a new trial. *See Martindale,* 246 Wis. 2d 67, ¶ 30.

*By the Court.*—Judgment and order reversed and cause remanded with directions.