BRENNAN, J.
¶ 1 Frederick Eugene Walker appeals from a judgment of conviction, entered on a jury verdict, of repeated sexual assault of T.C.B. between November 2011 and September 2012, when she was under sixteen years old. He also appeals the order denying his postconviction motion.
¶ 2 Walker sought a new trial for three reasons. His first two reasons related to testimony by the victim's mother when she was answering a question about her shock at learning of the assaults. She stated that she "honestly could not believe that the situation she was in took place" and added "But [T.C.B.] don't lie." Trial counsel did not object to the mother's statement or argue that it constituted vouching for the victim's honesty and was therefore a Haseltine[1] violation. Walker argued that this is grounds for a new trial in the interest of justice and that counsel's failure to move for a mistrial constituted constitutionally ineffective assistance. His third reason related to evidence of T.C.B.'s sexual activity. Walker had argued at trial, after the jury heard that T.C.B. had obtained contraceptives, that the curative admissibility doctrine[2] gave him the right to question her about her sexual history. He argued that without additional information about her sexual activity, the jury would infer that she had obtained contraceptives solely because she was being sexually assaulted by Walker. The trial court held that any such questioning would violate the rape shield law, WIS. STAT. § 972.11(2) (2015-16)[3] , which "generally prohibits the introduction of any evidence of the complainant's prior sexual conduct 'regardless of the purpose.' " State v. Ringer , 2010 WI 69, ¶ 25, 326 Wis. 2d 351, 785 N.W.2d 448 (citation omitted).
¶ 3 The postconviction court denied Walker's postconviction motion without a hearing.[4] It concluded that the mother's testimony was admissible because it "was more about her own emotional struggle rather than vouching for her daughter's truthfulness" and therefore did not violate the Haseltine rule. The postconviction court also concluded that the testimony was admissible because evidentiary rules permit the mother to testify to T.C.B.'s "truthful character" after Walker had attacked her credibility. See WIS. STAT. § 906.08(1)(b) ("evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise"). The postconviction court concluded that during trial it had correctly barred questioning about T.C.B.'s sexual history because it would have been "a fishing expedition into how the victim had been sexually active." It further concluded that he was not entitled to a new trial in the interest of justice. We agree and affirm.
BACKGROUND
¶ 4 On January 9, 2014, T.C.B. told her high school basketball coach that Walker, her mother's boyfriend, "had inappropriately touched her and had sexual intercourse with her[.]" The same day, the coach reported the information to the police. Police then notified T.C.B.'s mother, N.S., of the allegations. Walker was subsequently charged with repeated sexual assault of a child. The matter proceeded to a jury trial. The evidence at Walker's trial consisted of the testimony of T.C.B., her twin sister, her mother, her basketball coach, and two detectives who had investigated the case. We set forth below the portions of the trial that are relevant to the issues raised in this appeal.
Trial counsel's opening statement.
¶ 5 In his opening statement, Walker's trial counsel referred to T.C.B.'s statements as "the various versions of the truth, so many versions" and as "varying shifting, changing truth." He started with this characterization of T.C.B.:
Nobody knows what [T.C.B.]'s going to say [in her testimony] because ... every time this young woman, who didn't like her mother's boyfriend and didn't like the fact that he was coming back into her life, every time she tells somebody the truth about what happened, it's different.
¶ 6 Trial counsel repeated this characterization twice more in his short opening statement. He said, "This is the same person, who every time she comes forward to tell the truth, tells a story that doesn't sound anything like the previous time she came forward to tell the truth." He described the disclosures to the jury as "start[ing] out with a disclosure to a trusted person, her coach ... about an incident where she was inappropriately touched" and then, "after a long period of time," during an interview preparing her for trial, "all of a sudden she tells the truth," and "it becomes all of these times." He repeatedly asserted that T.C.B.'s statements lacked "any corroborating evidence" such as "semen stains" or "dirty soiled undergarments," that there were inconsistencies in her accounts, and that the number and severity of the incidents she alleged grew over time. He closed by telling the jury it would be deciding whether there is "proof beyond a reasonable doubt that anything happened other than a young girl who didn't like her mother's boyfriend."
T.C.B.'s testimony.
¶ 7 T.C.B. testified that the assaults had begun during a period when Walker had lived with her family, and she said that the inappropriate touching started happening when she was "either twelve or thirteen." She testified that the first time she noticed something unusual with Walker was "kind of like eye contact or like a brush past my butt or something" and that this touching "happened again." She described the first occasion when Walker had penis-to-vagina sex with her in her mother's bedroom. She described two separate occasions when she was in the dining room of her mother's house when Walker came up behind her, pulled her pants down, and had penis-to-vagina sex with her "bending over." She described a time after she had taken a shower when Walker had penis-to-vagina sex with her on the living room floor. She described one time when Walker came into the room where she was sleeping. She testified, "he actually like woke me up and he was, like, do it again." She testified, "I used to say no, I'm asleep, or something like that.... But we actually had sex again."
¶ 8 During T.C.B.'s testimony about one of the times they had sex in the dining room, the State asked, "How did that end? ... Do you remember whether he finished?" T.C.B.'s answer was "Yeah, he did. He did, I guess." In response to T.C.B.'s "I guess," the State immediately asked, "Were you using condoms at all?"[5] When T.C.B. answered "yes," the State asked, "Whose condoms were they?" T.C.B. answered:
Since my dad asked me a question on a random day, he asked me was I having sex or being sexually active. And I told him yeah. So him and his girlfriend took me and [my sister] to Planned Parenthood. And they got me to take the Depo shot. And they gave me the pill-I mean they gave me like the extra condoms in a bag. So I kept them in the top drawer.
So he went there. I actually went in my moms's room because I didn't need them. I wasn't doing anything. So it was like every time he would do it, he would go into the drawer and take the condoms out of there.
¶ 9 T.C.B. testified that the assaults stopped when her family moved and she "stop[ped] seeing him for awhile."
¶ 10 T.C.B. was questioned at trial about whether she had told anyone about the assaults. She testified that she did not tell her mother what Walker was doing when it was happening, and when asked why, she explained, "I didn't know what she would think. Would she believe me if I told her this was happening." She testified that at a family reunion in August 2013, she was talking to a cousin, N., who "was going through some stuff," and "[t]hen it just came out and I told her."
¶ 11 T.C.B. described telling Walker during a brief phone call while he was in jail on an unrelated matter that she had "told [N.]" She testified that after she spoke with him, outside the house where her mother could not hear her, she walked back inside and gave the phone to her mother and sister, and Walker spoke with each of them. The phone call had been recorded by the jail, was later located and transcribed, and the transcript was entered into evidence at trial. The parties stipulated that "Walker called [the phone number] twice on August 16, 2013 and spoke with [T.C.B.] and [her twin sister], and their mother, [N.S.]" The recordings were played for the jury, and on the recording, Walker and T.C.B. have the following exchange:
T.C.B.: I only told [N.] [N.] said she not gonna tell nobody.
Walker: Oh my God!
T.C.B.: And I know something about her.
Walker: Why did you tell, why did you, why did you tell any muthafu-, why you talk to any muthafucka about that man? I'm just sayin', why would you, why would you do that shit? I had a feeling, something told me on the G,[6 ] man, to talk to you. That's why I called, I knew you, why would you talk to any muthafucka? Why would you tell [N.]? [N.], [N.] ain't gon' keep that. She gon' tell, dude. Man, I don't know what the fuck made you do that, man. Why the fuck you do that?
¶ 12 After the family moved and was no longer living with Walker, but before T.C.B. told any adult, she also told her twin sister what had happened: "I told her that I was having sexual intercourse with Fred." On cross-examination she described her sister's response: "I think she called me stupid. She want me to tell [my mother]. Or she just say why didn't you. Then she was just crying. Then she didn't say anything after that. And I never-I never brung it up around her again."
¶ 13 T.C.B. testified that at some point after that, Walker "started to come around some more." She described a day when Walker had come over and she was at home with her mother, who had just gotten off of work and was in the bathtub. She testified that while her mother was in the bathtub, Walker told her, "come here, give me a kiss, and stuff like that." Instead she went to talk to her mother in the bathroom. She decided at that point to tell her coach about the incidents with Walker. She told her coach that same day.
T.C.B.'s mother's testimony.
¶ 14 T.C.B.'s mother N.S. testified that she learned of the assaults when detectives came to her house and told her in January 2014. She testified that she had noticed a change in T.C.B.'s demeanor over the month prior to that but "couldn't understand what was the reason for her being angry." She testified that she told T.C.B. "if [you] won't talk to me, you can talk to somebody else of whatever your issue may be." However, she corroborated T.C.B.'s accounts about the phone call with Walker and the conversation with her in the bathroom even though she had not known at the time about the assaults.
¶ 15 N.S. testified that the first conversation she had about the assaults was with the detectives. The following exchange then occurred between the prosecutor and N.S.:
Q: Do you remember that first conversation with [T.C.B.]? ... [T]ell us about how [T.C.B.]'s emotions seemed, how your emotions were.
A: Well, my emotions went-I just broke down crying. I didn't-that this can't-I don't think-and so then when I went to the-I looked at her, and when I looked at her face, I'm, like, she doesn't lie. She's not going to lie. I'm, like, I just can't believe-and I just honestly could not believe that the situation she was in took place. And quite honestly, just was baffled. I was stuck for a long time. Still kind of numb about the situation. But [T.C.B.] don't lie.
Walker's motion to question T.C.B. about her sexual history.
¶ 16 A sidebar was held off the record at the time of N.S.'s testimony, and on the following day, at the beginning of the second day of trial, Walker's counsel put the following objection from the sidebar on the record:
[W]hen [T.C.B.] was testifying, she had been asked by the state about where the condoms came from. And she had indicated that she had been asked by her father if she was sexually active. She said yes. He got her Depo shots and got her condoms. And we had previously, I think properly, I was told, you know, we're not getting into her sexual history. I didn't have a problem with that. But when that comes out in front of the jury, it's not-it was never made clear to them. And I asked about it, and you said no. That I could get into, wait a minute, when she's talking about being sexually active here, [she's] not talking about being sexually active with the defendant, at least not according to all the police reports and things that I received.
And I felt that that was prejudicial because it makes it appear as though she was being sexually active with the defendant and therefore that's why she was getting into the birth control. At least that's the impression that I think the jurors are left with.
¶ 17 The trial court reiterated its denial of the motion from the previous day, saying it did not consider it "prejudicial at all" and that the denial was "based upon the prior ruling[,]" which was that the rape shield law prohibited the evidence.
The verdict, postconviction motion, and appeal.
¶ 18 Walker did not testify. The jury convicted Walker. A no-merit report was filed, and this court rejected it. Appellate counsel was appointed and filed the postconviction motion underlying this appeal, raising the issues identified by this court as potentially meritorious arguments. The trial court denied the motion without a hearing. Walker now appeals.
DISCUSSION
I. Walker did not receive ineffective assistance of counsel because the testimony is admissible under Haseltine and because it is admissible under WIS. STAT. § 906.08.
Relevant law and standard of review.
¶ 19 Walker's first argument is raised in the context of a claim of ineffective assistance of counsel. In order to obtain a new trial on the grounds that counsel rendered ineffective assistance, the defendant must show that trial counsel's representation was deficient. Strickland v. Washington , 466 U.S. 668, 687 (1984). The defendant must also show that he or she was prejudiced by the deficient performance. Id. Counsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness. Id. at 688. In order to demonstrate that counsel's deficient performance is constitutionally prejudicial, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
¶ 20 The basis for Walker's claim of deficient performance is that T.C.B.'s mother provided testimony that violated his rights under State v. Haseltine , 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984), when she said during her testimony, "T.C.B. don't lie." "No witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." Id. (concluding that an expert opinion that there was "no doubt whatsoever" that the complainant was an incest victim was inadmissible). See also State v. Romero , 147 Wis. 2d 264, 277-78, 432 N.W.2d 899 (1988) (holding that a witness could not testify that the complainant "was being totally truthful with us").
Haseltine does not bar the testimony about T.C.B. because the testimony had "neither the purpose nor effect" of attesting to T.C.B.'s truthfulness.
¶ 21 Our supreme court stated that under Haseltine , questions about another witness' testimony "are improper," but held that such testimony "do[es] not result in reversible error unless the opinion testimony 'creates too great a possibility that the jury abdicated its fact-finding role' to the witness and did not independently find the defendant's guilt." State v. Patterson , 2010 WI 130, ¶ 58, 329 Wis. 2d 599, 790 N.W.2d 909 (citation omitted). And testimony "[does] not amount to an opinion about [a witness's] truthfulness" if "neither the purpose nor the effect of the testimony [is] to attest to [the witness's] truthfulness." State v. Smith , 170 Wis. 2d 701, 718, 490 N.W.2d 40 (Ct. App. 1992). In Smith , a detective's testimony that a witness ultimately told him the truth during an interrogation was deemed not to be a Haseltine violation because the detective's testimony "was not an attempt to bolster [the witness's] credibility, but was simply an explanation of the course of events during the interrogation." Id.
¶ 22 Patterson and Smith make clear that a Haseltine violation analysis goes beyond the words of a witness. Smith requires a determination of whether the testimony was "an attempt to bolster [a witness's] credibility" and a determination of whether the testimony's purpose or effect "was to attest to [the witness's] truthfulness." Id. , 170 Wis. 2d at 718. Patterson requires us to determine whether the testimony in question " 'create[d] too great a possibility that the jury abdicated its fact-finding role' to the witness and did not independently find the defendant's guilt." Id. , 329 Wis. 2d 599, ¶ 58 (citation omitted).
¶ 23 The question that elicited the testimony in question was this: "Do you remember that first conversation with [T.C.B.]? ... [T]ell us about how [T.C.B.]'s emotions seemed, how your emotions were." In an emotional response, T.C.B.'s mother described her thoughts as she was looking at her daughter's face the day she learned of the assaults: "I'm, like, she doesn't lie. She's not going to lie. I'm, like, I just can't believe-and I just honestly could not believe that the situation she was in took place." She added that she was "baffled" and "numb," and then added, again, "[T.C.B.] don't lie."
¶ 24 The cases in which testimony has been found to be improper vouching are cases where a witness has given an opinion about whether a witness was lying in court. See Romero , 147 Wis. 2d at 277-78 (witness said another witness "was being totally truthful with us"), State v. Echols , 2013 WI App 58, 348 Wis. 2d 81, 831 N.W.2d 768 (trial court erred in admitting testimony from defendant's employer that defendant spoke normally but stuttered when he was lying), and State v. Tutlewski , 231 Wis. 2d 379, 605 N.W.2d 561 (Ct. App. 1999) (expert witness testified that developmentally disabled witness was incapable of lying).
¶ 25 In contrast, this court has found it not to be a Haseltine violation where testimony has revealed a witness's assessment of truthfulness prior to trial. See State v. Snider , 2003 WI App 172, 266 Wis. 2d 830, 668 N.W.2d 784 (testimony from investigating detective that during course of investigation he believed victim's statement and did not believe defendant's version of what had occurred did not violate Haseltine rule), and State v. Miller , 2012 WI App 68, 341 Wis. 2d 737, 816 N.W.2d 331 (comments of detective during video-recorded interview with defendant which was played for jury, stating that defendant was lying during the interview, were not a Haseltine violation).
¶ 26 The facts here are distinguishable from those in cases where a Haseltine violation has been found. First, the question the prosecutor asked was about the witness's emotional reaction to learning of the assaults-not a question about T.C.B.'s truthfulness as a witness. Second, T.C.B.'s mother's answer was clearly an expression of her shock and the conflict she felt when she looked at her daughter's face after learning of the assaults-not an opinion about T.C.B.'s honesty. In fact, she stated as part of the answer that she "could not believe" the accusations. She stated that she "could not believe that the situation ... took place," that she "can't believe," and that "this can't-I don't think-." At the same time she was feeling that "she doesn't lie," "she's not going to lie," and "T.C.B. don't lie." In this context, the testimony is similar to the admissible testimony of the detective in Smith . There, the testimony about the truthfulness of a witness was "simply an explanation of the course of events during the interrogation," Smith , 170 Wis. 2d at 718, and here, it is simply an explanation of the mother's reaction to seeing her daughter and learning of the accusations.
¶ 27 Applying the test in Smith and Patterson , we conclude that this testimony had neither the purpose nor effect of attesting to T.C.B.'s truthfulness. It did not constitute a violation of Haseltine , and it therefore was not deficient performance for Walker's trial counsel to fail to move for a new trial.
T.C.B.'s mother's testimony was admissible under WIS. STAT. § 906.08 and Eugenio .
¶ 28 WISCONSIN STAT. § 906.08 allows certain character evidence that is otherwise inadmissible once a witness's character for truthfulness has been attacked. The determination of whether a witness's character has been attacked such that § 906.08 can be invoked is made by the trial court, and on review, we defer to the trial court's ruling because such a ruling "necessarily requires a [trial] court to weigh the impact of the proffered character allegations based on their content and the tenor with which they are offered." State v. Eugenio , 219 Wis. 2d 391, 399, 579 N.W.2d 642 (1988). "Because we cannot suitably evaluate such factors based on a cold record, a [trial] court's decision that a witness's character for truthfulness has been attacked is due the deference that this court normally awards evidentiary rulings." Id.
¶ 29 Walker argues that Eugenio set a standard that was not met in this case. Eugenio stated:
Character is evinced by a pattern of behavior or method of conduct demonstrated by an individual over the course of time. Thus, allegations of a single instance of falsehood cannot imply a character for untruthfulness just as demonstration of a single instance of truthfulness cannot imply the character trait of veracity. Viewing the attack on a witness in its context, the [trial] court must believe that a reasonable person would consider the attack on the witness to be an assertion that the witness is not only lying in this instance, but is a liar generally. Only in such circumstances will rehabilitative evidence under WIS. STAT. § 906.08(1) be appropriate.
Id. at 404-05 (emphasis added). He argues that this record reflects that the opening statement did not contain assertions that T.C.B. "is a liar generally," and therefore § 906.08(1) was not triggered and the mother's testimony is inadmissible as rehabilitative evidence.
¶ 30 However, a close reading of Eugenio and its application of the standard to the facts there does not support Walker's conclusion. Our supreme court did state that it was "narrow[ing] the interpretation of the scope of evidence admissible under WIS. STAT. § 906.08(1) [.]" Id. at 405. At the same time, it stated that it was "reaffirm[ing] that the determination of whether the character of truthfulness of a witness is being challenged is a matter left to the proper discretion of the circuit court." Id. "This determination is not dependent upon particular labels placed on witnesses or even express accusations of untruth ." Id. (emphasis added). The trial court is to base its determination on "the substance of the character allegations offered and on the manner and tenor in which the attack on the witness's character for truthfulness is presented." Id.
¶ 31 In Eugenio , "during opening statements, defense counsel highlighted several inconsistent statements made by the victim concerning the circumstances surrounding her alleged sexual abuse by the defendant." Id. at 399-400. In concluding her opening arguments, defense counsel then stated, "You will hear all these different versions because every time she's told someone the story has changed." Id. at 400. The facts, in other words, are all but identical to what happened here. In Walker's case, the postconviction court (which was also the trial court) stated that "the jurors were led to believe in opening statement that the victim had so many versions of the truth it was impossible to know which version to believe." It made a finding that "this attack on the victim's credibility by the defense through opening statement was sufficient enough to allow the mother's testimony to stand, and the court would have ruled accordingly had an objection been made."
¶ 32 Under Eugenio , we review this finding with deference. In that case, as in this one, the opening statement featured references to "different versions" the victim had told of the assaults. Id. It is reasonable to infer from such a statement that it is intended to mean that the victim lied on more than one occasion. In reviewing the trial court's determination that such statements by Eugenio's counsel had constituted an attack on the witness's credibility, our supreme court stated, "The [trial] court here determined that the victim's character for truthfulness was under attack through assertions that the victim repeatedly lied to gain attention." Id. at 406. It concluded that this determination was not an erroneous exercise of discretion. Id.
¶ 33 Almost identical words were used in the opening statement in this case. We conclude that the postconviction court's determination that T.C.B.'s character for truthfulness was under attack was not an erroneous exercise of discretion. Because that finding stands, the rehabilitative testimony was admissible. Because the testimony was admissible, failing to object to the testimony cannot constitute deficient performance by trial counsel. See State v. Swinson , 2003 WI App 45, ¶ 59, 261 Wis. 2d 633, 660 N.W.2d 12 (failure to make a meritless argument does not constitute deficient performance).
II. The trial court did not erroneously exercise its discretion in excluding evidence of T.C.B.'s sexual history, and if it was error, it was harmless.
¶ 34 Walker argues that T.C.B.'s testimony about having obtained birth control "created the false impression that she was using birth control because of the alleged conduct with Walker." Walker argues that "such false impression was prejudicial and warranted the admission of evidence to correct it." He sought at trial to "clarify that T.C.B. was sexually active with persons other than Walker and because of those relations, she was using birth control." He argued that although such questioning would ordinarily be barred by the rape shield law, WIS. STAT. § 972.11(2), it is required in this case under the doctrine of curative admissibility. That doctrine was described in State v. Dunlap as follows:
Under the version of this doctrine that has been adopted in Wisconsin, when one party accidentally or purposefully takes advantage of a piece of evidence that is otherwise inadmissible, the court may, in its discretion, allow the opposing party to introduce otherwise inadmissible evidence if it is required by the concept of fundamental fairness to cure some unfair prejudice.
Id. , 2002 WI 19, ¶ 32, 250 Wis. 2d 466, 640 N.W.2d 112 (emphasis added).
¶ 35 In Dunlap , the starting point of the analysis was an examination of the evidence the defendant challenged in order to "assess whether any evidence offered by the State opened the door." Id. Dunlap had argued that the State's expert's testimony that the victim's behavior was "consistent with that of other sexual assault victims" and that this opened the door to his proffered evidence of unusual sexual conduct of the six-year-old girl he was accused of molesting. Id. , ¶¶ 8, 33. The court concluded that the challenged testimony was "not offered as substantive proof that [the child] had been sexually assaulted by Dunlap" but instead was "offered to respond to the inconsistencies in [the victim's] testimony that had been pointed out by the defendant on cross-examination and to explain the circumstances of [the victim's] reporting behavior." Id. , ¶ 40. It concluded that the testimony was admissible. Id. That determination was dispositive of the curative admissibility question: "[The testimony] was admissible and thus did not open the door to Dunlap's proffered evidence." Id. , ¶ 41 (emphasis added).
¶ 36 The question here is whether T.C.B.'s testimony about the existence of the condoms opened the door under this doctrine to otherwise impermissible questions about her sexual activity with others. Just prior to trial, as the trial court considered motions in limine , the following exchange occurred between the prosecutor and the court:
[Prosecutor]: I will ask that the Court prohibit the defense from introducing any rape shield evidence, the child, or any other witness.
[The court]: That would go without saying unless it's brought before the Court.
¶ 37 Under the Dunlap analysis, which controls here, the threshold question is whether the complained-of evidence was admissible; admissible evidence does not open the door to the "curative" evidence Walker sought to introduce. The context of T.C.B.'s testimony that she told her father she was sexually active was her explanation of the source of the condoms that were used during the assaults. The use of condoms was relevant to T.C.B.'s testimony concerning the sex act in the dining room, and it was offered for a purpose other than "as substantive proof" of the sexual assaults. Like the evidence in Dunlap , this evidence was admissible given the purpose for which it was offered. Because the evidence was admissible, it did not open the door to curative evidence from Walker, and the trial court did not erroneously exercise its discretion in excluding such evidence.
¶ 38 Although it is not necessary to say more given our conclusion, we note that even if the State's evidence were to be deemed inadmissible such that it would open the door, the curative admissibility doctrine leaves the next question-whether to allow contrary evidence-to the discretion of the trial court. See id. , ¶ 32 ("the court may, in its discretion, allow the opposing party to introduce otherwise inadmissible evidence" (emphasis added) ). Further, it cannot be shown here, given the testimony, that if the trial court had permitted Walker to obtain an answer from T.C.B. about her sexual history, there is a "reasonable probability of a different outcome." See State v. Kleser , 2010 WI 88, ¶ 94, 328 Wis. 2d 42, 786 N.W.2d 144. Therefore, even if excluding the evidence was an erroneous exercise of discretion, the error is harmless. See Martindale v. Ripp , 2001 WI 113, ¶ 30, 246 Wis. 2d 67, 629 N.W.2d 698.
III. Walker is not entitled to a new trial in the interest of justice under WIS. STAT. § 752.35.
¶ 39 Walker argues that the combination of the two errors means that the real controversy-"T.C.B.'s credibility and the veracity of her story"-was not fully tried[7] because her mother's testimony wrongly invaded the jury's credibility determination and the exclusion of evidence of T.C.B.'s sexual history wrongly left the jury with the impression that the birth control was directly related to the fact that T.C.B. was having sex with Walker. We have concluded that the trial court's decisions on both issues were sound. There is therefore no basis for granting a new trial in the interest of justice.
¶ 40 For these reasons, we conclude that the postconviction court correctly denied Walker's motion without a hearing
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

State v. Haseltine , 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984) ("No witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth.").

"The curative admissibility doctrine is applied when one party accidentally or purposefully takes advantage of a piece of evidence that would normally be inadmissible." State v. Dunlap , 2002 WI 19, ¶ 14, 250 Wis. 2d 466, 640 N.W.2d 112. "Under such circumstances, the court may allow the opposing party to introduce otherwise inadmissible evidence if it is required by the concept of fundamental fairness to prevent unfair prejudice." Id.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The Honorable Jeffrey A. Wagner presided over the trial and denied Walker's postconviction motion without a hearing. To be clear about what happened when, we refer to the circuit court as the trial court when discussing the trial and as the postconviction court when discussing the postconviction procedures.

In its brief opposing Walker's postconviction motion, the State explained that the question was intended to "explain why [T.C.B.] wouldn't know if [Walker] 'finished' and to show that there [had been] precautions taken by the Defendant."

Multiple online slang dictionaries, including the Online Slang Dictionary, define the phrase "on the G" as meaning "literally, for real, honestly." See http://onlineslangdictionary.com/meaning-definition-of/on-the-g.

Wisconsin Stat. § 752.35 permits reversal in the interest of justice:
In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record[.]