¶7 Generally speaking, Haseltine prohibits a witness at trial from testifying about the veracity of another witness. In Haseltine , we concluded that it was error to allow a psychiatrist to testify that there "was no doubt whatsoever" that a child witness was an incest victim. Haseltine , 120 Wis. 2d at 95-96. We explained that such testimony "goes too far" because it is "an opinion that [the victim] was telling the truth." Id. at 96.
¶8 We later applied this principle to a lay witness's testimony in State v. Echols , 2013 WI App 58, 348 Wis. 2d 81, 831 N.W.2d 768. In Echols , a witness who was familiar with the defendant testified that Echols "always stutters when he lies." Id. , ¶26. Echols then testified, and stuttered during his testimony. Id. , ¶27. The lay witness in Echols did not directly state that Echols was lying when Echols gave his version of the events, but the Echols court held that the net effect was the same. The admission of the witness's testimony was reversible error because the witness "presented herself as a human lie detector." Id. , ¶24.
¶9 Consistent with Echols , we have subsequently stated that, under the Haseltine rule, testimony is admissible if "neither the purpose nor the effect of the testimony [is] to attest to" another witness's truthfulness. See State v. Miller , 2012 WI App 68, ¶¶14-15, 341 Wis. 2d 737, 816 N.W.2d 331.
¶10 Branson's specific argument arises in the context of a dispute at trial over whether the methamphetamine found in Branson's vehicle belonged to Branson or, instead, to his passenger Queen. Queen testified that when he and Branson were stopped by police, Branson pulled a "bag of drugs" from his "pants area," tried to give it to Queen, and ended up dropping it between Queen's seat and the center console. Queen responded by "knock[ing] that bag towards the backseat." Later, both men were interviewed at the police station. At trial, the questioning officer described Queen as cooperative and indicated that Queen answered questions consistent with his trial testimony. In contrast, the officer told the jury that Branson failed to make eye contact and appeared nervous. During the interview, Branson effectively implicated Queen by telling the officer that Branson did not know anything about methamphetamine being in his car.
¶11 Branson's argument focuses on the part of the officer's trial testimony in which the officer contrasts the behavior of the two men during their interviews. Branson argues that his counsel deficiently failed to object to the following testimony. The officer testified that Queen:
• "[was] very talkative";
• "would look me in the eye";
• "was calm, he looked me in the eye";
• "seemed more than happy to help clear this thing up";
• was "cooperative."
As to Branson, the officer testified:
• "I noticed that [Branson] wouldn't look me in the eye";
• "I'd ask him a question and either he would not answer it[,] or give some sort of vague answer";
• "[Branson] appeared nervous, he wasn't looking me in the eye, he seemed fidgety";
• "[Branson] didn't answer questions completely; very vague about them."
Notably, the officer did not give an opinion about the relative truthfulness of the two men. During closing arguments, the prosecutor and Branson's counsel argued contrary interpretations of this behavior evidence and other behavior evidence admitted during the trial. The prosecutor argued that Queen's behavior during the interview indicated that Queen was calm and helpful because he was innocent, and that Branson's behavior indicated the opposite. Branson's counsel argued the flip side. He argued that Queen was one of "those people [who] can turn onto a role when they need [to] ... really can turn on the salesman." He also drew the jury's attention to how Queen's behavior changed from the time of the police interview to the time of his trial testimony, where, according to counsel, Queen acted "very defensive."
¶12 We conclude that the challenged testimony does not violate the Haseltine rule. Describing the behavior of another person when that person is communicating in some manner does not effectively attest to that person's truthfulness within the meaning of Haseltine and subsequent cases such as Echols and Miller .
¶13 To the contrary, the officer's testimony here was completely unremarkable. As is true in countless cases, the witness here related what another person said and described how that person acted when making the statement. In such cases, it is up to the jury to decide how to interpret the described behavior and whether to give weight to the description.
¶14 Moreover, in a prior decision, we affirmed the admissibility of testimony that was easily more problematic than the testimony against Branson. In State v. Davis , 199 Wis. 2d 513, 545 N.W.2d 244 (Ct. App. 1996), a police officer testified that two witnesses, who testified against the defendant, prior to trial "[g]ave very good statements," and that they were "excellent witnesses." Id. at 519. We concluded that this testimony "did not unfairly taint the fact-finding process." Id. at 521. We think it obvious that the challenged testimony in Davis was less neutral than the testimony here.
¶15 It follows that Branson's trial counsel did not perform deficiently when counsel did not object to the testimony set forth above.
¶16 Before concluding, we choose to comment on a Seventh Circuit case on which Branson, understandably, places heavy reliance. In United States v. Williams , 133 F.3d 1048 (7th Cir. 1998), the court discussed testimony that is directly comparable to the challenged testimony in this case. In Williams , a federal agent questioned the defendant about a bank robbery. Id. at 1050. While testifying about the questioning, the agent said that the defendant, in response to being told that he had been identified by a teller as the robber, " 'turned and began avoiding eye contact with us, kind of lowered his head, and he thought about it for a moment and then said that he didn't rob a bank.' " Id. at 1052. The agent went on to relate his strategy in questioning the defendant, what he said to the defendant, and described the defendant's reaction to that: " 'And while I'm making these statements he was-had his head held down and he was nodding as if in agreement with these statements.' " Id. at 1052-53.
¶17 Based on this testimony, and without citing to any authority, the Seventh Circuit opined:
The admission of this testimony also presents some concerns.... Williams denied that he participated in the robbery, yet Special Agent Johnson purports to be a human lie detector in observing Williams' demeanor. These observations are improper characterizations of the defendant and useless in the determination of innocence or guilt, and in fact, they tend to prejudice the jury. It is Williams' denial of guilt that is important and not the manner in which he communicates it.
Id. at 1053. We are unable to reconcile the Williams court's discussion with the testimony of the agent in that case. The agent did not give his opinion of the suspect's truthfulness; rather, he described the suspect's reaction. Obviously, the prosecutor, and likely the agent, thought it would be sensible for the jury to draw the inference that the suspect's reactions indicated a guilty mind, but in no way did the agent "purport[ ] to be a human lie detector." See id.
¶18 We acknowledge that we cited Williams as supporting authority in our Echols decision and, in particular, pointed to the above discussion. See Echols , 348 Wis. 2d 81, ¶24. But we did not adopt the Williams discussion, nor was there any reason to. Unlike Williams , the challenged witness in Echols did purport to be a human lie detector by telling the jury that the witness could tell when Echols was lying because of a tell; the witness told the jury that Echols "always stutters when he lies." Echols , 348 Wis. 2d 81, ¶26. The challenged testimony in Echols is very different than the testimony discussed in Williams .
Conclusion
¶19 For the reasons stated above, we affirm the judgment of conviction and the order denying postconviction relief.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.